UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
UNITED STATES OF AMERICA                       :
                                               :
    -against-                                  :                    Notice of Motion to Suppress
                                               :
MAHWANGA CAMPBELL,                             :
                                               :                    25-CR-218
        Defendant.                             :
---------------------------------------------------------X

PLEASE TAKE NOTICE, that the defendant, **Mahwanga Campbell**, by his attorney **Charles Millioen**, of the Federal Defenders of New York, and upon the accompanying memorandum of law, will move the Court, before the Honorable Judge Eric N. Vitaliano, United States District Judge for the Eastern District of New York for an Order:

1.     Suppressing all evidence recovered as a result of the unconstitutional search of Mr. Campbell's cell-site location information and all evidence recovered as a fruit of the unconstitutional search, pursuant to Fed. R. Crim. P. 12(b)(3)(C) and the Fourth Amendment of the United States Constitution, and

2.     In the alternative, directing that a hearing be held outside the presence of the jury before trial as to the admissibility of the evidence; and,

3.     Granting such other and further relief as the Court may deem just and proper.


DATED: BROOKLYN, N.Y.

    February 7, 2026



_____
Charles Millioen
Attorney for Mahwanga Campbell
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
charles_millioen@fd.org

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA               :
                                       :
   -against-                          :           <u>MEMORANDUM OF LAW</u>
                                       :
MAHWANGA CAMPBELL,                     :           25-CR-218
                                       :
   Defendant.                          :
----------------------------------------------------------X

**Memorandum of Law
in Support of
Motion to Suppress Evidence**

_____
Charles Millioen
Attorney for Mahwanga Campbell
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
charles_millioen@fd.org

Table of Contents

PRELIMINARY STATEMENT ................................................................................................. 1

    I.     How Cellular Networks and Tower Dumps Work ..................................................... 3

    II.    The Tower Dump In This Case ................................................................................. 6

    III.   The Subsequent Warrants ....................................................................................... 10

        A.    The Government's May 2, 2024 Warrant for Historical Cell-
        Site Location Information Associated with Mr. Campbell's 980-
        371-2666 Number ...............................................................................................11

        B.    The Government's February 11, 2025 Warrant for Verizon
        Cellphone Location and Pen Register Information Associated with
        Mr. Campbell's 980-371-2666 Number ................................................................ 13

        C.    The Government's March 24, 2025 Warrant to Search a
        White Apple iPhone and Gray Apple iPhone Seized from Mr.
        Campbell During his February 13, 2025 Arrest...................................................... 15

        D.    The Government's May 16, 2025 Warrant to Search Data
        from Mr. Campbell's Apple Accounts ................................................................. 15

LEGAL ARGUMENT ......................................................................................................... 16

    I.     The Tower Dump Warrant That Seized Mr. Campbell's Cellular Location
    Data Was an Unparticularized, Overbroad, General Warrant ........................................ 16

        A.    People Have a Reasonable Expectation of Privacy in CSLI
        Obtained from a Tower Dump ............................................................................. 16

        B.    The Third-Party Doctrine Does Not Apply .................................................. 21

        C.    People Have a Property Interest in CSLI Obtained from a
        Tower Dump ..................................................................................................... 22

        D.    The Tower Dump Was an Overbroad and Unparticularized
        General Warrant ................................................................................................ 25

        E.    The Warrant Application Failed to Establish Probable Cause
        That Relevant Location History Existed................................................................ 33

        F.    The Good-Faith Doctrine Does Not Apply .................................................. 37

II.      Evidence Seized Pursuant to Warrants that Relied on Information Obtained Directly or Indirectly from the Tower Dump is Fruit of the Poisonous Tree and Should be Suppressed ....................................................................... 41

       A.      The May 2, 2024 Warrant Affidavit Supporting the Search of Historical Cell-Site Data is Tainted by Unlawfully Obtained Evidence and is Therefore Void .............................................................. 42

       i.      Without The Unlawfully Obtained Tower Dump Data, the May 2, 2024 Search Warrant Application Facially Lacked Probable Cause .................................................................................................. 42

       ii.      The Government Failed to Establish a Nexus Between the Alleged Crime and Mr. Campbell's Cell Phone ...................................... 44

       B.      The February 11, 2025 Warrant for Prospective Cell-Site Location Information is Tainted by Unlawfully Obtained Evidence and is Therefore Void ........................................................................ 45

       C.      The March 24, 2025 Warrant to Search Two iPhones Seized During Mr. Campbell's Arrest is Tainted by Unlawfully Obtained Evidence and is Therefore Void. ........................................................... 47

       D.      The May 16, 2025 Warrant for Data From Mr. Campbell's Apple Accounts is Tainted by Unlawfully Obtained Evidence and is Therefore Void. ..................................................................................... 48

CONCLUSION ..................................................................................................... 49

## Table of Authorities

**Cases**

*Carpenter v. United States*, 585 U.S. 296 (2018).................................................... passim

*Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)........................................... 28

*Ex parte Jackson*, 96 U.S. 727 (1878) .................................................................... 23

*Florida v. Jardines*, 569 U.S. 1 (2013) ................................................................... 22

*Franks v. Delaware*, 438 U.S. 154 (1978) ............................................................... 37

*Groh v. Ramirez,* 540 U.S. 551 (2004)................................................................. 39, 40

*Herring v. U.S.,* 555 U.S. 135 (2009) ....................................................................... 38

*Illinois v. Gates*, 462 U.S. 213 (1983).............................................................. passim

*In re Application of U.S. for Historical Cell Site Data*, 747 F. Supp. 2d 827, 831 (S.D. Tex. 2010) .............................................................................................................. 3

*In re Four Applications for Search Warrants Seeking Info. Associated with Particular Cellular Towers a/k/a Tower-Dump Warrants*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000 (S.D. Miss. Feb. 21, 2025)................................................................ passim

*In re Implementation of the Telecomms. Act of 1996*, 13 FCC Rcd. 8061 (1998) ........................ 24

*In re Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. and Other Customer Info.*, 28 FCC Rcd. 9609 (2013)................... 24

*In re Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730 (N.D. Ill. 2020) ................................................................................................................ 20

*In re United States for an Ord. Pursuant To 18 U.S.C. §2703(d)*, No. 2:17-MC-51662, 2017 WL 6368665, at *2 (E.D. Mich. Dec. 12, 2017). ............................................................... 7

*Kyllo v. United States*, 533 U.S. 27 (2001) ................................................... 17, 18, 26

*Leaders of a Beautiful Struggle v. Baltimore Police Department,* 2 F.4th 330 (4th Cir. 2021) ..... 18

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ...................................... 23

*Marron v. United States,* 275 U.S. 192 (1927) ....................................................... 28

*Maryland v. Pringle,* 540 U.S. 366 (2004) .................................................................. 27

*Matter of Search of Info. that is Stored at Premises Controlled by Google*, LLC, 542 F.
　Supp. 3d 1153, 1156 (D. Kan. 2021) ................................................................... 27

*Matter of the Application of the U.S.A. for an Order Pursuant to 18 U.S.C. §§ 2703(c) &
　2703(d) Directing AT&T, Spring/Nextel, T-Mobile, Metro PCS & Verizon Wireless to
　Disclose Cell Tower Log Info.*, 42 F. Supp. 3d 511, 519 (S.D.N.Y. 2014) .......................... 7

*Matter of Tower Dump Data for Sex Trafficking Investigation*, No. 23 M 87, 2023 WL 1779775,
　at *4 (N.D. Ill. Feb. 6, 2023) ........................................................................ 7

*Murray v. United States*, 487 U.S. 533 (1988) ....................................................... 2, 41

*Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276 (4th Cir. 2004) .................................... 32

*Owner Operator Independent Drivers Ass'n, Inc. v. NY State Dept. of Transportation,* 40
　N.Y. 3d 55 (2023 .................................................................................. 41

*People v. Brown,* 96 N.Y.2d 80 (2001) ............................................................... 28

*People v. Mothersell,* 14 N.Y. 3d 358 (2010) ....................................................... 32

*People v. Nieves,* 36 N.Y. 2d 396 (1975) ........................................................... 32

*Riley v. California,* 573 U.S. 373 (2014) ................................................. 2, 16, 23, 28

*Smith v. Maryland,* 442 U.S. 735 (1979) ............................................................ 16

*Snitko v. United States*, 90 F.4th 1250 (9th Cir. 2024) ............................................ 28

*Soldal v. Cook Cty.*, 506 U.S. 56 (1992) ........................................................... 22

*Stanford v. Texas,* 379 U.S. 476, 485 (1965) .................................................... 19, 41

*State v. De Simone*, 60 N.J. 319, 322 (1978). ...................................................... 33

*State v. Wright*, 961 N.W.2d 396 (Iowa 2021) ....................................................... 24

*Steagald v. United States*, 451 U.S. 204, 220 (1981). ............................................. 28

*Terwilliger v. Reyna,* 4 F.4th 270 (5th Cir. 2021) ................................................. 27

*U.S. v. Zemlyansky,* 945 F.Supp.2d 438 (S.D.N.Y. 2013) ............................................ 38

*United States v. Bertini,* 2023 WL 8258334 ..................................................... 34, 36

*United States v. Buck,* 813 F.2d 588 (2d Cir. 1987) ........................................................ 39

*United States v. Chowdhury,* 2025 WL 298917, No. 23-CR-278 (NRM) (E.D.N.Y. Oct. 22, 2025) ................................................................................................................................ 6

*United States v. Di Re*, 332 U.S. 581 (1948) ....................................................... 2, 26

*United States v. Fuentes*, 2025 WL 484628 (E.D. Ok. 2025) ...................................... 27

*United States v. George*, 975 F.2d 72 (2d Cir. 1992) ....................................... 37, 39, 40

*United States v. Gonzales,* 399 F.3d 1225 (10th Cir. 2005) ......................................... 38

*United States v. Jarvis,* 560 F.2d 494, 497 (2d Cir. 1977) ........................................... 32

*United States v. Jones*, 565 U.S. 400 (2012) ................................................... passim

*United States v. Karo*, 468 U.S. 705 (1984) ............................................................ 18

*United States v. Lauria,* 70 F. 4th 106 (2d Cir. 2023) ....................................... 33, 34, 35

*United States v. Leary*, 846 F.2d 592 (10th Cir. 1988) ............................................... 40

*United States v. Leon*, 468 U.S. 897 (1984) ........................................... 37, 38, 39

United States v. Marti, 421 F.2d 1263 (2d Cir. 1970) ................................................ 39

*United States v. Medina,* 712 F.Supp.3d 226 (D.R.I. 2024) ........................................ 19

*United States v. Raymonda*, 780 F.3d 105 (2d Cir. 2015) ........................................... 42

*United States v. Silva*, 146 F.4th 183 (2d Cir. 2025) ................................................. 44

*United States v. Smith,* 110 F.4th 817 (5th Cir. 2024) ........................................ passim

*United States v. Spurlock,* 778 F. Supp. 3d 1136 (D. Nev. 2025) .............................. 21, 26, 29, 31

*United States v. Trzaska*, 111 F.3d 1019 (2d Cir. 1997) ............................... 41, 43, 44, 46

*United States v. Vasey*, 834 F.2d 782 (9th Cir. 1987) ................................................ 42

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ............................................ 23

*United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015) ......................................... 40

*Walczyk v. Rio,* 496 F.3d 139 (2d Cir. 2007) .......................................................... 27

*Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 307 (1967) ................................................ 25

*West v. Cabell*, 153 U.S. 78, 86 (1894) ....................................................................... 32

*Wong Sun v. United States*, 371 U.S. 471  (1963) ........................................... 2, 41, 43

*Ybarra v. Illinois*, 444 U.S. 85 (1979) .................................................. 27, 29, 39

**Statutes**

47 U.S.C. § 1002 ............................................................................................ 25

47 U.S.C. § 207 .............................................................................................. 24

47 U.S.C. § 222 .............................................................................................. 24

**Other Authorities**

Ahamed, MM, Faruque, S., 5G Network Coverage Planning and Analysis of the Deployment Challenges, *Sensors* (2021) ................................................................. 5

Black's Law Dictionary (11th ed. 2019) ...................................................................... 23

Brian Fung, *The Future of 5G Mobile Data Could Hinge on a Battle over Utility Pole Fees*, Wash. Post, Sept. 24, 2018 ................................................................... 4

Brian L. Owsley, *The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps in its Electronic Surveillance*, 16 U. Pa. J. Const. L. 1 (2013) .................................. 3, 5

Clare Duffy, "What is 5G? Your questions answered," *CNN Business* (2020), available at: https://www.cnn.com/interactive/2020/03/business/what-is-5g/ ................................................ 4

Haley Amster, Brett Diehl, *Against Geofences*, 74 Stan. L. Rev. 385, 388 (2022) ........................ 3

Hannah Arendt, Origins of Totalitarianism (1968) ....................................................... 21

Jennifer Valentino-DeVries, *Cellphone Carriers Face $200 Million Fine for Not Protecting Location Data*, N.Y. Times (Feb. 28, 2020) ........................................................... 25

Joseph Cox, *Here's the FBI's Internal Guide for Getting Data from AT&T, T-Mobile, Verizon*, Vice Magazine, (10/25/2021) available at https://www.vice.com/en/article/how-fbi-gets-phone-data-att-tmobile-verizon/ ................................................................... 5

Joseph Hoy, *Forensic Radio Survey Techniques for Cell Site Analysis* (2d ed. Wiley 2024) (2015) ................................................................................................ 4, 6

Lars Daniel, "How Digital Forensics Experts Know Where You've Been—Cell Site
    Location Information," *Forbes* (2024), available at:
    https://www.forbes.com/sites/larsdaniel/2024/12/18/how-digital-forensics-experts-know-
    where-youve-been-cell-site-location-information/ ...................................................................... 5

NYU Furman Center, "Neighborhood Indicators" Data for Jamaica/Hollis (2023), available at:
    https://furmancenter.org/neighborhoods/view/jamaica-hollis ..................................................... 8

S. REP. 99-541, 9, 1986 U.S.C.C.A.N. 3555, 3563 ....................................................................... 3

William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv.
    L. Rev. 1821 (2016) .................................................................................................................. 24

Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human
    Mobility*, 3 Sci. Rep. 1376 (2013) ............................................................................................ 18

**Constitutional Provisions**

*U.S. Const.* amend. IV ............................................................................................................ 16, 28

## **PRELIMINARY STATEMENT**

Attempting to identify three suspects in a robbery, the government used a "tower dump" warrant to seize the private location information of 6,151 people, including Mr. Campbell—without demonstrating probable cause to search any individual person. The warrant commanded four major cellular service providers to provide personal data for every device that connected to any cell phone tower in four heavily populated areas of Jamaica, Queens. The warrant effectively tracked the movements of everyone in these four areas for approximately half an hour. In total, the government acquired 13,601 location records from 124 cellular towers and more than 183 antennae covering several highly sensitive locations. This personal data remains in the possession of the government with no limitation on its use.

This was a digital dragnet, not a valid warrant, and Mr. Campbell asks this Court to find it unconstitutional. Unlike a regular warrant authorizing the targeted search of a suspect based on particularized probable cause, this tower dump allowed police to rummage through the location data for *everyone* in four dense parts of Queens, without probable cause to search *anyone*. If investigators had cause to search Mr. Campbell, they could have obtained a warrant for his data specifically. They did not. Instead, this tower dump was, by design, overbroad and unparticularized. It was nothing less than a modern-day general warrant, "categorically prohibited by the Fourth Amendment." *In re Four Applications for Search Warrants Seeking Info. Associated with Particular Cellular Towers a/k/a Tower-Dump Warrants*, No. 3:25-CR-38-CWR-ASH, 2025 WL 603000, at *8 (S.D.

1

Miss. Feb. 21, 2025) ("In re Four Applications") (citing *United States v. Smith,* 110 F.4th 817, 838 (5th Cir. 2024)).

This tower dump enabled law enforcement to sweep up the location data of more than 6,000 New Yorkers at once, retroactively tracking their movements with just the click of a button. Such a digital fishing expedition, if permitted, threatens to resurrect the "reviled 'general warrants'…of the colonial era," *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)), and create the kind of "permeating police surveillance" that "the forefathers, after consulting the lessons of history, designed our Constitution to" prevent. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

In the wake of this tower dump, the government relied overwhelmingly on the fruits of that search to obtain five additional warrants. Those warrants sought cell phone data and information related to Mr. Campbell's cell phone, his prospective cell-site location information, the contents of two iPhones, and data from his Apple accounts. As a result, those warrants are tainted and all evidence derived from them should therefore be suppressed as fruit of an unlawful search. *Murray v. United States*, 487 U.S. 533, 536-37 (1988); *see Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

For the reasons forth in this brief, this Court should find that the tower dump warrant violated the Fourth Amendment, suppress all evidence obtained from it, and all fruits thereof. This encompasses every subsequent warrant that relied on evidence obtained by the initial unlawful search.

2

## BACKGROUND AND STATEMENT OF FACTS[1]

The tower dump warrant at issue in this case is a type of "reverse warrant" that police use when they do not know who they are looking for—and instead seek to search *everyone* in an area with the promise of identifying a suspect later. Such searches "effectively 'work in reverse' from the way traditional search warrants operate. *United States v. Smith*, 110 F.4th 817, 822 (5th Cir. 2024) (*citing* Haley Amster, Brett Diehl, *Against Geofences*, 74 Stan. L. Rev. 385, 388 (2022)). "Instead of law enforcement requesting that a third-party provider produce the location history of a particular suspect's device, [they] proceed first by giving investigators access to data for all cellular devices that were present near a crime scene around the time when the crime occurred." Amster & Diehl, *Against Geofences*, *supra at* 388; *see In re Four Applications*, 2025 WL 603000, at *4-6 (citing *Smith*, 110 F.4th at 838), and comparing geofences with tower dumps).

## I.    How Cellular Networks and Tower Dumps Work

In a cellular network, geographic areas are divided into "cells" or "cell sites" which can transmit calls, messages, or data. S. REP. 99-541, 9, 1986 U.S.C.C.A.N. 3555, 3563. When a caller dials a number, sends a message, or uses data on a cellular telephone, the phone sends signals over the air on a radio frequency to a cell site. *Id.* "At each cell (or cell site), there is a wireless antenna that 'detects the radio signal from the handset [i.e. a cellphone], and connects it to the local telephone network, the Internet, or another wireless network.'" Brian L. Owsley, *The Fourth Amendment Implications of the Government's Use of Cell Tower Dumps in its Electronic Surveillance*, 16 U. Pa. J. Const. L. 1 (2013) (citing *In re Application of U.S. for Historical Cell Site Data*, 747 F. Supp. 2d 827, 831 (S.D. Tex. 2010)). Cellular providers record each of these connections to their networks including the cell site used. *Id.* Cellular providers also record the

---

[1]These sections have been combined for ease of reading.

location of the cell site, and, where relevant, the azimuth and beamwidth of the antenna used to connect the device.[2] *See id.* Thus, cellular records can reveal the approximate location of a cellular device as well as the cell sites and antennae designed to cover a specific geographic area. *See* Hoy *supra*, at 259-264.

As the number of cell phone users (and demands on cellular networks) increase, so too does the number of cell sites. In addition to cell towers, cell sites can be found on "light posts, flagpoles, church steeples, or the sides of buildings." *Carpenter*, 585 U.S. at 300. As companies such as Verizon and AT&T switch to more advanced wireless services to deliver "ultrafast downloads," these companies will install "hundreds of thousands" of additional cell towers. *See* Brian Fung, *The Future of 5G Mobile Data Could Hinge on a Battle over Utility Pole Fees*, Wash. Post, Sept. 24, 2018. Despite the increasing coverage, the precision of cell-site location information ("CSLI") "depends on the geographic area covered by the cell site." *Carpenter,* 585 U.S. at 301. In 2018, this was sufficient to place a person "within a wedge-shaped sector ranging from one-eighth to four square miles," for example. *Id.* at 312. But as companies switch to more advanced "5G" wireless services to deliver greater bandwidth and downloads that could be "eventually be 100 times faster,"[3] they will need to "deploy a massive number of new cell sites" and "acquire hundreds of

---

[2] The azimuth angle of each antenna indicates the central pointing angle of the beam. Joseph Hoy, *Forensic Radio Survey Techniques for Cell Site Analysis*, 66-67 (2d ed. Wiley 2024) (2015). If the location of the cell site is known and if the beamwidth and azimuth are known, then an approximate area of use can be inferred for phones that used particular cells. *Id.* "There are two main configurations for cell site: omnidirectional and sectorized… An omnidirectional site uses radio antennas to broadcast their signal through 360° allowing all of the radio channels supported by the base station to potentially available anywhere within the site coverage area. A sectorized site, in contrast, employs directional antennas, which direct transmission of each radio channel to a specific part of the base station coverage area." *Id.* at 62.

[3] Clare Duffy, "What is 5G? Your questions answered," *CNN Business* (2020), available at: https://www.cnn.com/interactive/2020/03/business/what-is-5g/.

new small cell locations." Ahamed, MM, Faruque, S., 5G Network Coverage Planning and Analysis of the Deployment Challenges, *Sensors* (2021) at § 5.2.[4] As a result, a single CSLI data point from an area with a higher quantity of cell towers "can lead[] to more precise location data,"[5] and effectively subject any cell phone user to "tireless and absolute surveillance." *Carpenter,* 585 U.S. at 312.

Standard tower dumps, as conducted by law enforcement, "collect all of the historical records that providers maintain from a specific cell tower or towers. These 'records provide a listing of any cell phones that have utilized the cell phone tower for a particular time and date.'" Owsley, *Supra* at 21. This information gives them the location of the cellular antennae used by the device. Because the government, at the time of serving a tower dump warrant, has no suspect phone or individual human target, they must issue a warrant for *every major cellular provider* serving the area of the crime. Thus, tower dump warrants, by design, do not target a specific provider, individual, or device.

However, there are ways in which the government can limit the scope of these warrants. First, the government can log onto the FBI's cell site database (hereinafter "NDCAC database") and identify the cell sites designed to cover the target area as well as the azimuth and beamwidth of each antenna connected to the site.[6] This allows the government to identify both the cell sites and antennae most likely to have served any

---

[4] Available at: https://pmc.ncbi.nlm.nih.gov/articles/PMC8512478/.

[5] Lars Daniel, "How Digital Forensics Experts Know Where You've Been—Cell Site Location Information," *Forbes* (2024), available at: https://www.forbes.com/sites/larsdaniel/2024/12/18/how-digital-forensics-experts-know-where-youve-been-cell-site-location-information/.

[6] The cell site database operated by the National Domestic Communications Assistance Center ("NDCAC"), and was designed to assist federal, state, local and tribal law enforcement agencies with electronic surveillance. https://ndcac.fbi.gov It contains the location of the cell sites and antennae information, including, azimuth, frequency and beamwidth etc. Joseph Cox, *Here's the FBI's Internal Guide for Getting Data from AT&T, T-Mobile, Verizon*, Vice Magazine, (10/25/2021) available at https://www.vice.com/en/article/how-fbi-gets-phone-data-att-tmobile-verizon/.

phones in the target area for each cellular provider. The government could also conduct a drive test or a network survey of the area to identify the coverage area of each antenna in the area. *See* Hoy, *supra* at 281-282. The government can also use a combination of the two methods—first identifying the antennae likely serving the area using the cell site database and then confirming the estimates with drive testing. The cell site and specific antennae covering the area can then be named in the warrant to avoid obtaining location data from individuals who are likely not at the crime scene.[7]

## II.    The Tower Dump In This Case

The warrant in this case sought customer records, from four major cellular providers, for any and all individuals who connected to any of an unidentified number of cell towers across four different locations, over an approximately half-hour period. Exhibit A. While the government specified four geographic locations, it failed to specify the cell sites covering the target areas making the collection of data much broader than necessary.[8]

The government provided a single affidavit in support of a warrant to be served on four providers – AT&T, Verizon Wireless, T-Mobile U.S. Inc., and Sprint Corporation. Exhibit A. The affidavit explained, in relevant part, that two individuals wearing face

---

[7] Along with geographic and temporal limitations, the government can take additional measures regarding extraneous location data by segregating and destroying non-responsive data obtained pursuant to a tower dump. The warrant in this case contained no limitations on what the obtained data could be used for, including the data of all passersby who connected to any of the towers in this investigation. Courts have noted segregation of responsive data as an appropriate measure for other types of digital data. *See United States v. Chowdhury,* 2025 WL 298917, No. 23-CR-278 (NRM) at 32 (E.D.N.Y. Oct. 22, 2025) (discussing the segregation of responsive data pursuant to a device search).

[8] Cellular providers were also not required or asked to segregate the data to those unique numbers which had connected to the cell towers more than once. While Attachment B II. contemplated that "the government may only seize information relevant to phones that connected to towers identified in this warrant at more than one of the times identified in this warrant…" section I. which governs what is to be provided to the government by the provider had no such restrictions. Thus, the idea that this data was not already seized is a mere legal fiction because the limitation did not prevent the government from possessing, viewing, analyzing, or retaining the data of everyone connecting to the towers.

masks assaulted and robbed a United States Postal Worker in front of 11031 Union Hall Street in Jamaica, Queens, New York, as he was delivering the mail at approximately 10:57 a.m. on September 2, 2023. *Id.* at ¶ 5. Using security camera footage, the government identified three additional locations to which they believed the same individuals had fled. *Id.* at ¶¶ 8 & 9.

Despite these four identified locations, the warrant did not identify the specific cell sites, sectors, or antennae from each carrier that the government was targeting. Instead, the government merely provided four addresses and demanded the phone companies turn over CSLI from "Cell Towers that Provide Cellular Service to the Following Locations." Exhibit A, attachment A. The government did not identify the specific cell sites or antennae connected to each cell site they were targeting. This is because police apparently neither used the NDCAC cell site database, nor conducted a drive test to identify the cell sites or antennae serving the area of the crime.

Additionally, the warrant did not provide a plan for handling the private data of other individuals in the area that the government would inevitably seize.[9] It did not state that the government would segregate, return, or destroy non-responsive or extraneous

---

[9] *Supra* n.7. Courts have imposed all kinds of limitations on post seizure analysis and use of data from tower dumps. These protections include things like: 1) explicit protocols for identifying responsive/target numbers, *see Matter of Tower Dump Data for Sex Trafficking Investigation*, No. 23 M 87, 2023 WL 1779775, at *4 (N.D. Ill. Feb. 6, 2023) ("Sex Trafficking")(only allowing the seizure of data that appears in two or more locations); *Perry*, 184 N.E.3d 769 (same); 2) segregation and/or deletion of non-responsive CSLI from innocent users, *id.*; *see also Sex Trafficking*, at *4; 3) notification to innocent users that their data was obtained; *Owsley III*, 945 F. Supp. 2d at 771; or 3) some other protocol for handling the data of innocent third parties. *See Owsley I*, 930 F. Supp. 2d at 702; *Owsley II*, 964 F. Supp. 2d at 678; *Matter of the Application of the U.S.A. for an Order Pursuant to 18 U.S.C. §§ 2703(c) & 2703(d) Directing AT&T, Spring/Nextel, T-Mobile, Metro PCS & Verizon Wireless to Disclose Cell Tower Log Info.*, 42 F. Supp. 3d 511, 519 (S.D.N.Y. 2014); *In re United States for an Ord. Pursuant To 18 U.S.C. §2703(d)*, No. 2:17-MC-51662, 2017 WL 6368665, at *2 (E.D. Mich. Dec. 12, 2017).

data—let alone provide a protocol for executing the limitations. In short, the warrant allowed the government to do whatever it wanted with the personal data of thousands of people both during and after the seizure and during the subsequent search of the data, without demonstrating probable cause as to Mr. Campbell or to any individual person. This lack of a stated and enforceable plan for data, much like the initial seizure, effectively grants the government complete discretion as to which data to retain and what to do with it.

The resulting seizure of location data was massive. Jamaica is one of New York City's largest neighborhoods, and as of 2023 when this warrant was issued, was estimated to have a population of 242,984 people.[10] As a result of the population density and the broad scope of the warrant AT&T provided 10,639 location records of 5,248 people from 51 cell towers.[11] To this number, T-Mobile added 1,271 location records of 843 people from 55 towers and 68 antennae. Finally, Verizon contributed 1,691 additional location records of 60 people from 18 towers and 115 antennae. In total, the government obtained 13,601 location datapoints from 6,151 individuals. This data came from 183 cellular antennae (not including the AT&T network). The geographical area in question contained schools, locations of worship, medical facilities, and other sensitive and constitutionally significant locations, in addition to thousands of private homes. The approximate coverage area[12] of this tower dump (not

---

[10] NYU Furman Center, "Neighborhood Indicators" Data for Jamaica/Hollis (2023), available at: https://furmancenter.org/neighborhoods/view/jamaica-hollis.

[11] Due to the structure of the data we were unable to calculate the total number of AT&T antennae. There are likely many more than the totals included here.

[12] Defense acknowledges that the images displayed do not represent actual coverage areas of the antenna connected to each cell site. For demonstrative purposes defense has used the mapping system utilized by the FBI Cellular Analysis Survey team which depicts cell site antenna with a 120-degree sector using a shaded wedge indicating the general direction of the antennae. Joseph Cox, *Here's the FBI's Internal Guide for Getting Data from AT&T, T-Mobile, Verizon*, Vice Magazine (10/25/2021), available at https://www.vice.com/en/article/how-fbi-gets-phone-data-att-tmobile-verizon/. The shaded area in this depiction extend .5 miles and an includes an edge line that extends 1 mile.

including AT&T)[13] is depicted below in Figure 1. It is plain that the reach of the search extends far beyond the locations listed in the warrant. In fact, some of the antenna or sectors likely do not actually serve the areas listed. However, because the warrant only uses the term "towers,"[14] without identifying specific cell sites or sectors, these distant points were included in the data returned by the cellular providers, demonstrating the clear overbreadth of the warrant.



Figure 1. Total tower dump coverage areas overlayed on map of Jamaica, NY.

---

[13] The data provided by the government does not include AT&T cell sites. However, government agents have access to that information through NDCAC portal and could therefore estimate the general area of a device using that resource. *See id.*

[14] Towers and cell sites are not the same. Even if the terms were to be read interchangeably, towers are not synonymous with antennae, and solely identifying "towers" would necessarily return data from antennae that do not service the relevant area.



Figure 2 and 3. Multiple places of worship and medical clinics within coverage areas.



Figure 4 and 5. An example of a major transit hub and high school within coverage areas.

## III.    The Subsequent Warrants

The government used the tower dump data to identify Mr. Campbell's phone number as being present at the four locations that the robbery suspects or suspect vehicles were seen on surveillance footage. Using this identification, the government sought and received approval from United States Magistrate Judges for five more search warrants between November 20, 2023 and May 16, 2025. Those search warrants sought, among other things, information pertaining to Mr. Campbell's cellular devices and personal digital information, including historical cell-site location information, prospective cell-site location information, the contents of two cell phones, and data from his Apple accounts (i.e. emails, messages, files, activity, call logs, location data).

The following chart identifies search warrants at issue in the instant motion.

| Date (Defense Exhibit) | Issuing Magistrate Judge | Information Authorized to be Seized by the Search Warrant |
|---|---|---|
| September 19, 2023 (Exhibit A) | Honorable Cheryl Pollak | AT&T, Verizon, T-Mobile, and Sprint tower dump records from September 2, 2023 at the following locations and times: 11029 Union Hall St., Jamaica, NY from 10:50 a.m. to 11:00 a.m.; Liberty Ave., & Merrick Blvd, Jamaica, NY from 11:00 a.m. to 11:05 a.m.; 9023 171 St., Jamaica, NY from 11:10 am to 11:20 am; and 168 St., & Hillside Ave., Jamaica, NY from 11:15 a.m. to 11:25 a.m. |
| November 20, 2023[15] | Honorable Peggy Kuo | T-Mobile data associated with the telematics system of a black 2019 Mercedes Benz E30 with New York License Plate KZZ9901 |
| May 2, 2024 (Exhibit B)[16] | Honorable James R. Cho | AT&T historical cell-site location information associated with three phone numbers, including 980-371-2666 (Mahwanga Campbell's number) |
| February 11, 2025 (Exhibit C) | Honorable James R. Cho | Verizon cellphone location and pen register information for Mr. Campbell's 980-371-2666 number |
| March 24, 2025 (Exhibit D) | Honorable Paige J. Gossett | Searches of a white Apple iPhone and gray Apple iPhone seized from Mr. Campbell during his February 13, 2025 arrest |
| May 16, 2025 (Exhibit E) | Honorable Taryn A. Merkl | Data from Mr. Campbell's Apple accounts |

United States Postal Inspector Steven He submitted an affidavit in support of each of these search warrant requests.

### A. The Government's May 2, 2024 Warrant for Historical Cell-Site Location Information Associated with Mr. Campbell's 980-371-2666 Number

In its May 2, 2024 search warrant application, the government sought judicial approval to obtain AT&T historical cell site location information associated with three phone numbers,

---

[15] On November 22, 2023, T-Mobile submitted an objection to this demand, stating that the referenced vehicle's telematics system did not run on T-Mobile's network. Therefore, this warrant will not be addressed in the instant motion.

[16] Personal identifying information of third parties has ben redacted from Exhibit B.

including Mr. Campbell's 980-371-2666 phone number ("2666 number"). Exhibit B. Inspector He's affidavit disclosed basic facts of the robbery, such as the location, incident, suspect descriptions, identification of a grey Ford pickup truck used during the commission of the crime, and the truck's path of travel after the robbery. *Id.* at ¶¶ 6-9. The affidavit also describes a black Mercedes used by "Target Subjects" and license plate reader data detailing the Mercedes' travel between Queens and the Bronx on August 25, 2023 and September 3, 2023. *Id.* at ¶¶ 11-12.

The May 2, 2024 affidavit cited data obtained from the tower dump warrant, which identified a phone associated with Mr. Campbell's 2666 number as being present at the four locations that the robbery suspects or the suspect vehicles were seen on surveillance footage. *Id.* at ¶¶ 13-14. Inspector He wrote "based on my review of law enforcement databases, I have learned that a dark grey Ford F150" was registered to Mr. Campbell in North Carolina. *Id.* at ¶ 15. Further investigation resulted in photos of the truck with "a crack next to the driver's side taillight and a defective passenger side taillight with tape over it, consistent with the Grey Ford used during the robbery." *Id.*

The affidavit details an interview with an unnamed female witness at an unknown date and time. *Id.* at 16. The witness identified Mr. Campbell in a photograph. *Id.* The witness claimed ownership of the black Mercedes and stated that Mr. Campbell has driven the car before. *Id.* She further stated that around September 3, 2023, Mr. Campbell was in New York to help bring her to North Carolina. *Id.* She confirmed that Mr. Campbell drove a grey pickup truck, but that she has not seen it with any visible damage. *Id.* She denied involvement in the robbery. *Id.*

The affidavit cited additional tower dump data, including subscriber and billing information associated with the phone number of a second cell phone that was present at each of the four dates, times, and locations requested. *Id.* at 17. Similarly, the tower dump results

identified registration information for a third phone number associated with a cell phone that was present at three of the requested dates, times, and locations. *Id.* at 19. Inspector He noted that AT&T records showed communication between these two phones on and around the date of the robbery. *Id.* at 19. The affidavit makes no other connection between those phones and the robbery. The affidavit did not describe communication between either of these two phones and Mr. Campbell's phone on or around the date of the robbery.

In the affidavit, Inspector He relied on "training and experience" to assert that robbery suspects often use cell phones. *Id.* at ¶ 20.

### B. The Government's February 11, 2025 Warrant for Verizon Cellphone Location and Pen Register Information Associated with Mr. Campbell's 980-371-2666 Number

In its February 11, 2025 search warrant application, the government sought judicial approval to obtain location information and pen register information for Mr. Campbell's 980-371-2666 number. Exhibit C. Inspector He's affidavit includes as an exhibit the Complaint filed against Mr. Campbell. Exhibit C, ¶ 8. The Complaint describes the facts of the robbery, such as the location, incident, suspect descriptions, identification of a grey Ford pickup truck with visible damage used during the commission of the crime, and footage of the suspects. Complaint, ¶¶ 5-11.

The complaint purportedly identifies Mr. Campbell as the driver of the Mercedes by comparing a law enforcement photo of him with an unclear screenshot from MTA bus video footage. *Id.* at 12. Inspector He also wrote that the MTA bus video captured the license plate of the Grey Ford truck, which was not mentioned in the earlier warrants. *Id.* at 13.

Inspector He summarized the interview of the unnamed witness. Complaint, ¶ 14. The content of the interview is similar to that described in the May 2, 2024 warrant. Exhibit B, ¶ 16.

In the Complaint, Inspector He writes that the witness provided agents with Mr. Campbell's 2666 number. *Id.* at ¶ 14. Like the May 2, 2024 warrant, the Complaint describes Inspector He's review of law enforcement databases identifying Mr. Campbell's vehicle, license plate reader photos of Mr. Campbell's gray Ford truck, and Inspector He's comparison of Mr. Campbell's truck to the gray Ford used during the robbery. *Id.* at 15-16.

The Complaint also describes Inspector He's review of NYPD records and body camera footage of an arrest of Mr. Campbell on October 13, 2023. *Id.* at ¶ 16. Inspector He wrote that Mr. Campbell was driving a 2005 Honda Accord with excessively tinted windows and a temporary South Carolina license plate. *Id.* Officers stopped the car and arrested him for driving on a suspended license. They searched the vehicle and found another South Carolina temporary license plate in the trunk. *Id.* They discovered that the license plates were forged. *Id.* Inspector He noted that the VIN listed on one of the forged plates was one digit off from the VIN of Mr. Campbell's gray Ford truck. *Id.* In the Complaint, he also noted the similarity between a photo of the forged plate and a photo of the license plate on the gray Ford used in the robbery. *Id.*

The Complaint also references cellphone data obtained from the earlier warrants. *Id.* at ¶¶ 17-20. AT&T subscriber and billing records connect the 2666 phone to Mr. Campbell. *Id.* Historical cell-site data from the May 2, 2025 warrant shows that a phone associated with the 2666 number travelled from North Carolina to Yonkers on September 1, 2023. *Id.* at ¶ 18. The historical cell-site records also show that on September 2, 2023 the 2666 number connected to towers near the location of the robbery, path of travel of the suspect vehicles after the robbery, and near the black Mercedes after the robbery. *Id.* at ¶¶ 19-20.

14

In the February 11, 2025 affidavit, Inspector He also described his reliance on records from AT&T, Verizon, TracFone, Google LLC, and Yahoo, Inc. to connect Mr. Campbell to the 2666 number. *Id.* at ¶¶ 9-13.

### C. The Government's March 24, 2025 Warrant to Search a White Apple iPhone and Gray Apple iPhone Seized from Mr. Campbell During his February 13, 2025 Arrest

In its March 24, 2025 warrant application, the government sought judicial approval to search a white Apple iPhone and gray Apple iPhone seized from Mr. Campbell during his arrest on February 13, 2025. Exhibit D. Inspector He attached the Complaint - described above - to the March 24, 2025 affidavit. *Id.* at ¶ 8. Again, Inspector He described his reliance on records from AT&T to connect the 2666 phone to Mr. Campbell. *Id.* at ¶ 11. Like the Complaint, the affidavit referenced the historical cell-site data from the May 2, 2025 warrant to show the 2666 number's path of travel before and during the robbery. *Id.* at ¶¶ 11, 18.

In the March 24, 2025 affidavit, Inspector He referenced AT&T records showing that Mr. Campbell's 2666 phone made or received at least ten voice calls over the course of a three and a half hour period on the morning of the robbery. *Id.* at ¶ 12. He also wrote that the 2666 phone made or received over 30 voice calls over the course of a 15 hour period after the robbery. *Id.*

In the affidavit, Inspector He again describes his reliance on various records from phone service providers, Apple, Google LLC, and Yahoo, Inc. to connect Mr. Campbell to the 2666 number and different iPhones. *Id.* at ¶¶ 13-20. He also detailed the February 13, 2025 arrest of Mr. Campbell, which resulted in law enforcement's recovery of the two iPhones. *Id.* at ¶¶ 22-24.

### D. The Government's May 16, 2025 Warrant to Search Data from Mr. Campbell's Apple Accounts

In its May 16, 2025 warrant application, the government sought judicial approval to obtain data from Mr. Campbell's Apple accounts. Exhibit E. In the May 16, 2025 affidavit,

15

Inspector He again referenced the Complaint. *Id.* at ¶ 7. He also attached the March 24, 2025 warrant and affidavit to search the two iPhones obtained during Mr. Campbell's arrest. *Id.* at ¶ 8.

Inspector He referenced information obtained through a partial extraction of data obtained from the iPhones seized pursuant to the prior warrant. *Id.* at ¶¶ 10 & 11. The gray iPhone contained images and videos of checks and someone's social security card. *Id.* The white iPhone contained images of other people's identification, checks, and screenshots of text messages. *Id.* The warrant sought additional data from Mr. Campbell's Apple accounts. *Id.* at ¶ 14.

## LEGAL ARGUMENT

**I.      The Tower Dump Warrant That Seized Mr. Campbell's Cellular Location Data Was an Unparticularized, Overbroad, General Warrant**

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure . . . against unreasonable searches and seizures[.]" *U.S. Const.* amend. IV. The Fourth Amendment protects "legitimate expectation[s] of privacy" from being "invaded by government action." *Smith v. Maryland,* 442 U.S. 735, 740 (1979) (internal quotations omitted). This expectation of privacy has been found legitimate in both cell phones and cell phone location data by the Supreme Court. *See Riley v. California,* 573 U.S. 373 (2014); *Carpenter v. United States,* 585 U.S. 296 (2018).

### A. People Have a Reasonable Expectation of Privacy in CSLI Obtained from a Tower Dump

To ensure that technology does not erode the "degree of privacy against government that existed when the Fourth Amendment was adopted," the United States Supreme Court has repeatedly held that the use of technology to collect information effectively unknowable through traditional techniques triggers constitutional protections. *Carpenter*, 585 U.S. at 305 (quoting

16

*United States v. Jones*, 565 U.S. 400, 406 (2012) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). As Justice Alito explained in *Jones*, because "[i]n the precomputer age, the greatest protections of privacy were neither constitutional nor statutory, but practical," technologies that allow easy evasion of those practical limits require constitutional regulation. 565 U.S. at 429 (Alito, J., concurring).

There is little question that tower dumps are such a technology. Police have never before had the capability to call up a near-perfect record of virtually *every* person who was in a particular area at a particular time, including inside homes, doctor's offices, places of worship, and other constitutionally protected spaces. Like a time machine, tower dumps enable law enforcement to reconstruct the historical movements of hundreds or thousands of people at once, limited only by corporate retention policies. *See Carpenter*, 585 U.S. at 312. Such a feat would have been impossible at the time of the adoption of the Fourth Amendment, limited by "a dearth of records and the frailties of recollection." *Id.* Instead, tower dumps represent an unprecedented expansion of law enforcement's ability to locate people in time and space, granting police "access to a category of information otherwise unknowable." *Id.*

As in *Carpenter*, the CSLI generated by tower dumps is "qualitatively different" from traditional forms of police surveillance because it is "comprehensive," "retrospective," "intimate," and "easy" to access for investigators. *Id.* at 309–312. It is comprehensive because it provides "near perfect surveillance, as if [the government] had attached an ankle monitor to the phone's user." *Id.* at 312. Indeed, users generate it with sufficient frequency that it "faithfully follows" cell phone users wherever they go, including "private residences, doctor's offices, political headquarters, and other potentially revealing locales." *Id.* at 311. Such continuous and

17

absolute surveillance, for hundreds or thousands of people at once, is without parallel in traditional investigative techniques.

Tower dumps are especially intimate and deeply revealing because even a small number of location data points discloses individuals' private whereabouts and facilitates inferences about their habits of life. The data can disclose the location of individuals (including, necessarily, non-suspects) in non-public and constitutionally sensitive places, such as the home, doctor's office, protest, or place of worship. *See, e.g., id.* at 311; *see also Leaders of a Beautiful Struggle v. Baltimore Police Department,* 2 F.4th 330, 343 (4th Cir. 2021) ("it is almost always possible to identify people by observing even just a few points of their location history").[17]

Further, the Supreme Court has repeatedly found that precise, short-term searches run afoul of the Fourth Amendment where, as here, they could reveal information inside constitutionally protected spaces. *See United States v. Karo*, 468 U.S. 705, 715 (1984) (Fourth Amendment protects against warrantless electronic tracking that locates a person in their home, especially when such presence "could not have been visually verified" by police); *Kyllo*, 533 U.S. at 30, 37 (finding using thermal imaging to peer through walls of a home a search, even though scan "took only a few minutes" and could not show much detail inside). Notably, the location data obtained in this case accurately located the movements of some individuals at over 20 points across the targeted geographic areas and time periods. Further, the phone numbers, names, and addresses of these individuals can be easily gleaned from this data.

Indeed, the tower dumps here encompassed residential neighborhoods, medical clinics, places of worship, and other highly sensitive locations frequented by thousands of people in a

---

[17] The Fourth Circuit cited here to Yves-Alexandre de Montjoye et al., *Unique in the Crowd: The Privacy Bounds of Human Mobility*, 3 Sci. Rep. 1376 (2013) for the proposition that 95% of cell phone users can be identified solely from four randomly chosen location history data points.

18

heavily populated area of New York City. Moreover, the areas covered by these tower dumps included public parks, schools, medical centers, churches, and multiple major rail routes, expressways, transit hubs, and proximity to major subway lines in Queens including the F, E, J, and Z trains. The New York MTA estimated in 2023 that on an average Saturday, like September 2, 2023, when this warrant was executed, that 2,356,521 people rode the subway in New York City. Thus, the all-encompassing sweep of CSLI from over four different locations at issue here could reveal a great deal about users' private and constitutionally protected activities, a clear breach of the "scrupulous exactitude" required when search and seizure implicates "First Amendment freedoms." *Stanford v. Texas,* 379 U.S. 476, 485 (1965).

The Court's concern in *Carpenter* and *Jones* was the risk of exposing "indisputably private" information, "'the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on.'" *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring); *Carpenter*, 585 U.S. at 311. The tower dump warrant here would do just that, placing devices inside residences, churches, mosques, medical centers, spanning major expressways, rail, and transit routes, and more across multiple areas of Jamaica on a Saturday.

It is of little importance that the duration of the intrusion sought by the government here is shorter than in *Carpenter*. Rather, as the Fifth Circuit instructed in *United States v. Smith*, "the potential intrusiveness of even a snapshot of precise location data should not be understated." 110 F.4th 817, 833 (5th Cir. 2024). The District Court of Rhode Island offered an apt description regarding the expanse of data sought by tower dumps in stating that, "[t]ower dumps are narrow

as to the individual suspect…but are broad as to third-party data." *United States v. Medina,* 712 F.Supp.3d 226, 238 (D.R.I. 2024).[18]

The Supreme Court decided *Carpenter* on the facts before it, and the shorter of the two court orders at issue was for a period of seven days. *Carpenter*, 585 U.S. at 302. Seven days was not a magic number with some higher constitutional significance. *See id.* at 395–96 (Gorsuch, J., dissenting). In fact, the second CSLI order only produced only two days of records, not the full seven as requested. *Id*. at 302. *Carpenter* does not suggest that the Fourth Amendment would condone warrantless searches for a shorter period of time or imply a *de minimis* exception to the Fourth Amendment. Rather, *Carpenter* explicitly declined to determine "whether there is [any sufficiently] limited period [of time] for which the Government may obtain an individual's historical CSLI free from Fourth Amendment scrutiny." *Id*. at 310 n.3; *see also In re Search of Info. Stored at Premises Controlled by Google*, 481 F. Supp. 3d 730, 737 (N.D. Ill. 2020) ("[T]here is much to suggest that *Carpenter's* holding, on the question of whether the privacy interests in CSLI over at least seven days, should be extended to the use of geofences involving intrusions of much shorter duration."). Likewise, the Court did not express a view on tower dumps or real-time CSLI because those facts were not present in the record. *Carpenter*, 585 U.S. at 316. But it would require misreading the rest of the Court's opinion to view this judicial restraint as an invitation to engage in such warrantless surveillance.

Finally, as in *Carpenter*, tower dumps are remarkably "easy, cheap, and efficient compared to traditional investigative tools."  585 U.S. at 311 ("With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense."). And like GPS tracking of cars, "it is almost impossible to think of late–

---

[18] Vacated and remanded on other grounds regarding the good-faith exception. *See United States v. Medina,* 125 F. 4th 310 (1st Cir. 2025).

18th-century situations that are analogous" to tower dumps. *Jones*, 565 U.S. at 420 (Alito, J., concurring). A government could never deploy enough police officers or informants to obtain the information it can easily acquire through a tower dump. To capture every person's whereabouts in a specific geographic area without CSLI would be practically impossible, prohibitively expensive, and inconsistent with basic freedoms in a democratic society. *Cf.* Hannah Arendt, *Origins of Totalitarianism* 431 (1968) (discussing corrosive effects of "a system of ubiquitous spying where everybody may be a police agent and each individual finds himself under constant surveillance").

### B.  The Third-Party Doctrine Does Not Apply

Additionally, cell phone users, including Mr. Campbell, retain a reasonable expectation of privacy in their cell phone location information obtained via tower dumps unaltered by the so-called "third-party doctrine." *United States v. Spurlock,* 778 F. Supp. 3d 1136, 1143 (D. Nev. 2025). "People whose information would be reveled in a tower dump did not opt in to sharing their location with the wireless companies targeted by this type of warrant." *Id.* at 1144 (citing *United States v. Smith,* 110 F. 4th 817, 835 (5th Cir. 2024) for the proposition that "electronic opt-in processes" are not meaningfully informed or voluntary).

The tower dump data here is just as "retrospective" as the CSLI at issue in *Carpenter*. Over 6,000 New Yorkers' movements across multiple densely populated areas of Jamaica, NY were retrieved and reconstructed over a part of their day. Indeed, it is the same data discussed in *Carpenter*, capable of "reconstruct[ing] a person's movement []," such that the person "has effectively been tailed every moment of every day." *Id.* at 312. But here, it not only allows police to "travel back in time" and retrace one person's whereabouts with precision over multiple locations, but enables them to do so for everyone, *en masse*, without knowing who to follow in

advance. *Id*. And as in *Carpenter*, because there are "400 million devices in the United States," and not just those belonging to suspects, "this newfound tracking capacity runs against everyone." *Id*.

Moreover, the *Carpenter* Court explicitly stated that cell phone users do not "voluntarily" assume the risk of turning over a comprehensive dossier of their physical movements to police in any "meaningful sense." *Id.* Because carrying a phone is "indispensable to participation in modern society" and because a phone generates CSLI "by dint of its operation, without any affirmative act on the part of the user beyond powering up," the Court declined to extend the third-party doctrine to historical CSLI. *Id.* That same logic applies squarely to the CSLI in this case. The duration of the government's search does not change the fact that people do not abandon their privacy interest in their location data simply by using a cell phone.

In sum, cell phone users have a reasonable expectation of privacy in their CSLI obtained via tower dumps because, as in *Carpenter*, the data is comprehensive, retrospective, intimate, and easy for law enforcement access. And as discussed in *Spurlock* and *Smith*, the so-called "third-party doctrine" should not alter this calculus.

### C.  People Have a Property Interest in CSLI Obtained from a Tower Dump

Tower dumps separately trigger constitutional protections because they invade cell-phone users' property rights.[19] Although searches are often properly analyzed under the reasonable-expectation-of-privacy framework, the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test" for searches and seizures. *Jones*, 565 U.S. at 409. Under that test, when the government interferes with a person's possessory rights in order to obtain information, a search has occurred. *Id*. at 404–05; *accord Florida v. Jardines*, 569

---

[19] If this Court properly holds that a search occurred under the reasonable-expectation-of-privacy framework, it need not address whether a search independently occurred under the property framework.

U.S. 1, 5 (2013). Likewise, a seizure occurs when one's property rights are violated, even if the property is never searched. *Soldal v. Cook Cty.*, 506 U.S. 56, 62–64, 68 (1992); *see also Carpenter*, 585 U.S. at 397 (Gorsuch, J., dissenting) (noting that "the traditional approach asked if a house, paper or effect was yours under law. No more was required to trigger the Fourth Amendment.").

Digital records can be a person's "papers" no less than physical documents. *See United States v. Warshak*, 631 F.3d 266, 285–86 (6th Cir. 2010) (recognizing that "it would defy common sense" to afford data less Fourth Amendment protection based on the medium of storage); *see also Riley*, 573 U.S. at 397–98 (describing personal data stored in the cloud as one's "papers and effects"). And a person can retain constitutional protection of their papers or effects even when those items are in another's possession, as is often true of electronic communications. *See, e.g.*, *Ex parte Jackson*, 96 U.S. 727, 733 (1878) (sealed letters in possession of postal service). The relevant question, then, is whether people hold enough of a property interest in their CSLI that it remains at least in part their "papers" under the Fourth Amendment, even though held by the cell-phone company.

They do. Possessory interest is defined as the "right to control property, *including the right to exclude others*." Black's Law Dictionary (11th ed. 2019) (emphasis added); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."). Property rights need not be exclusive to be effective, and a person can retain significant property rights in an item or location even if another entity holds equivalent or additional rights. *See, e.g.*, *Jones*, 565 U.S. at 404 n.2 (recognizing that a bailee of property has sufficient property rights for Fourth Amendment purposes).

23

Determining whether the government has interfered with the security of one's papers or effects within the meaning of the Fourth Amendment requires assessing a person's property rights in those items, including by reference to common-law trespass and property principles, *see id*. at 404 n.2, 404–05, or positive law (*i.e.*, statutes, regulations, and similar enactments), *see Carpenter*, 585 U.S. at 402–03 (Gorsuch, J., dissenting); *State v. Wright*, 961 N.W.2d 396, 415–17 (Iowa 2021) (relying on municipal ordinance to hold that police seizing and examining garbage is a trespassory search that requires a warrant under the state constitution).[20] When the law protects against access by the public without consent, unreasonable access by the government is prohibited as well. *Carpenter*, 585 U.S. at 402–03 (Gorsuch, J., dissenting); *Wright*, 961 N.W.2d at 417.

Positive law establishes the relevant property interests in the CSLI at issue here. The federal Telecommunications Act requires "express prior authorization of the customer" before a service provider can "use or disclos[e] . . . call location information," 47 U.S.C. § 222(f), and provides "customers a private cause of action for damages against carriers who violate the Act's terms," *Carpenter*, 585 U.S. at 405 (Gorsuch, J., dissenting) (citing 47 U.S.C. § 207). The Act also designates location information as "customer proprietary network information" ("CPNI")—a category of records that the service provider cannot disclose without "approval of the customer." 47 U.S.C. § 222(c)(1)–(2), (h)(1)(A). As the Federal Communications Commission explains, location information "clearly qualifies as CPNI," and therefore subjects service providers to "a duty to protect [its] confidentiality." *In re Implementation of the Telecomms. Act of 1996: Telecomms. Carriers' Use of Customer Proprietary Network Info. and Other Customer Info.*, 28 FCC Rcd. 9609, 9616 ¶ 22, 9619 ¶ 29 (2013). And "to the extent CPNI is property, . . .

---

[20] *See also* William Baude & James Y. Stern, *The Positive Law Model of the Fourth Amendment*, 129 Harv. L. Rev. 1821 (2016).

24

it is better understood as belonging to the customer, not the carrier." *Second Report & Order and Further Notice of Proposed Rulemaking, In re Implementation of the Telecomms. Act of 1996*, 13 FCC Rcd. 8061 ¶ 43 (1998), *vacated on other grounds by U.S. West, Inc. v. F.C.C.*, 182 F.3d 1224 (10th Cir. 1999). When carriers have violated these provisions by denying customers the right to control others' access to their location information, they have been subject to aggressive enforcement actions by the FCC and to private suits.[21]

Given these protections, "customers have substantial legal interests in this information, including at least some right to include, exclude, and control its use." *Carpenter*, 585 U.S. at 406 (Gorsuch, J., dissenting). In other words, individuals have a property right in their cell phone location records, making those records "their" papers for purposes of the Fourth Amendment. Where, as here, the government seeks access to those papers, it effects both a search and seizure requiring a valid warrant.[22]

### D. The Tower Dump Was an Overbroad and Unparticularized General Warrant

The tower dump warrant here was so overbroad and devoid of particularity that it was a general warrant, absolutely prohibited by the Fourth Amendment. Not only did it fail to establish probable cause for Mr. Campbell's information, or any of the other personal

---

[21] *See, e.g.*, Jennifer Valentino-DeVries, *Cellphone Carriers Face $200 Million Fine for Not Protecting Location Data*, N.Y. Times (Feb. 28, 2020), https://www.nytimes.com/2020/02/28/technology/fcc-cellphones-location-data-fines.html. In addition, the federal Communications Assistance for Law Enforcement Act, which otherwise requires phone companies to build lawful interception and surveillance capabilities into their networks, prohibits use of the federal pen register statute to "obtain any information that may disclose the physical location of the subscriber['s cell phone]." 47 U.S.C. § 1002(a)(2).

[22] Under the property-based approach, a request for even one data point in which a person has a property interest is a search and seizure. Thus, finding a search under the property-based approach does not hinge on the duration or breadth of the data requested.

25

location data searched and seized, but it also failed to appropriately limit the data seized by specifying the relevant cell sites and antennae.[23]

Tower dump warrants, as their name implies, do not target an individual phone or person. They are general warrants that are "not supported by probable cause and particularity." *In re Four Applications*, 2025 WL 603000, at *13. Tower dumps leverage modern cellular technology to travel back in time and search the location of every person in the general vicinity of a crime – a feat unimaginable at the founding of our nation. These mass searches are unparticularized, overbroad, and based on nothing more than one's "mere propinquity" to a crime. This is the definition of a general warrant. *Id.* at *13; *Spurlock*, 2025 WL 1095512, at *6-7. The lack of particularity in these warrants threatens to upend the "degree of privacy against government that existed when the Fourth Amendment was adopted", *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)), and create the kind of "permeating police surveillance" that "the forefathers, after consulting the lessons of history, designed our Constitution to" prevent. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

The tower dump in this case was distinctly unconstitutional in its over-seizure of data non-responsive to the warrant applications, namely the locations of thousands of devices that only made one connection to the stated cell towers. There is no limit on the number of devices whose data could be captured under the warrant, no means of anonymizing or otherwise

---

[23] Additionally, the Fourth Amendment requires a "nexus…between the item to be seized and criminal behavior." *See Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294, 307 (1967). The warrant application herein makes no attempt to provide such nexus here. No evidence is offered that any illegal activity under investigation in this case is linked to cell phone usage of any kind. No cell phone was purported to have been used to commit the illegal activity, and no cell phones were observed on any surveillance footage of the incident.

protecting the data of unconnected third parties, and no grounds for the request of half an hour's worth of data from anyone and everyone who happen to be located in an area. Moreover, Mr. Campbell's data was seized without any particularized probable cause, without any nexus between his device and his location information and the investigation at issue, and without any particular identification of him or the cellular service provider sought.

The tower dump also targeted four major cellular service providers without establishing probable cause that any one of them was actually in possession of relevant CSLI evidence. This is like serving warrants on every bank in the city on the basis that one of them may have the proceeds of a crime in an unknown safety deposit box. The Fourth Amendment requires "probable cause…based on particularized information about the place to be searched, not simply on a target's "'mere propinquity to…criminal activity.'" *See Walczyk v. Rio,* 496 F.3d 139, 163 (2d Cir. 2007) (internal citation omitted, quoting *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979)). The "belief of guilt must be particularized with respect to the person to be searched or seized." *See Terwilliger v. Reyna,* 4 F.4th 270, 282 (5th Cir. 2021) (citing *Maryland v. Pringle,* 540 U.S. 366, 371 (2004)). This means that, in addition to a particularized description of the data to be seized, the government must have probable cause that evidence of the crime is in the possession of the service provider they intend to seize the data from. *United States v. Fuentes*, Case No. CR-21-358-RAW at *24 (E.D. Ok. 2024), *adopted*, *United States v. Fuentes*, 2025 WL 484628 (E.D. Ok. 2025) (suppressing, in part, because enforcement made "absolutely no showing in the Affidavit for Search warrant that Google held evidence of a crime in its Location History data since it had no idea who committed the crime"), (citing *Matter of Search of Info. that is Stored at Premises Controlled by Google*, LLC, 542 F. Supp. 3d 1153, 1156 (D. Kan. 2021)).

27

With tower dump warrants, the government has no idea which, if any, phone company might be in possession of CSLI data linked to a suspect. The tower dump warrant in this case offers no connections between a particular cellular service provider, Mr. Campbell, and the investigation at issue—because there was none. This explains why the government serves the four major cellular providers in the area, but it does not justify it. Like serving warrants on every bank for evidence in an unknown deposit box, this kind of search would be clearly unconstitutional even when conducted against a single bank, let alone multiple institutions. *See e.g. Snitko v. United States*, 90 F.4th 1250, 1263–66 (9th Cir. 2024) (search of numerous safety deposit boxes pursuant to a warrant that purported to allow inventory searches violated Fourth Amendment, because individualized probable cause is required for valid criminal investigative search).

Further, a key component of the warrant requirement is the particularity clause. *See Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *see also U.S. Const.* amend. IV. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *See Marron v. United States,* 275 U.S. 192, 196 (1927); *see also People v. Brown,* 96 N.Y.2d 80, 84 (2001). Indeed, "[g]eneral searches have long been deemed to violate fundamental rights. It is plain that the [Fourth] amendment forbids them." *Marron*, 275 U.S. at 195. The Founders created the particularity requirement in response to one of the chief evils of their time: "general warrants," which "allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity," and were one of the direct causes of the American revolution. *Riley v. California*, 573 U.S. 373, 403 (2014). These general warrants were despised because they "specified only an offense … and left to the discretion of the executing

28

officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981).

Like the reviled general warrants of old, tower dump warrants describe only an offense or list of offenses for which they intend to uncover evidence. They do not describe the individual person, phone number, or even the phone company to be searched. Instead, they authorize a search for the location records of every person in an area in the hopes of uncovering one or more individuals who committed the crime or crimes alleged. This profound lack of particularity and probable cause is what makes them general warrants. *In re Four Applications*, 2025 WL 603000, at *13, *Spurlock,* 2025 WL 1095512, at *7.

Although the technology involved in this digital dragnet is relatively new, the proscribed conduct is not. The Supreme Court has long held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to a probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). Instead "a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." *Id.*

In *Ybarra* the government established probable cause to search a bartender named "Greg" for selling heroine inside of a bar and to search him for "'evidence of the offense of possession of a controlled substance'" while inside the "'Arora Tap Tavern.'" *Id.* at 88.  But the police also searched Mr. Ybarra, and 9 to 13 others present inside the same bar at the time. *Id.* at 89. During the search of Mr. Ybarra, they recovered six tinfoil packets of heroin from a cigarette pack in his pocket. *Id.* The Court suppressed the heroine, noting that "each patron who walked into the Aurora

Tap Tavern on March 1, 1976, was clothed with constitutional protection against an unreasonable search or an unreasonable seizure." *Id.* at 91.

Tower dumps, by design, target all individuals based merely on their proximity to a crime. Like the warrant in *Ybarra*, tower dumps articulate a crime. However, they also authorize search the private data of everyone in the area of that crime. The present case is a clear example. The warrant established probable cause to believe that a crime occurred in front of 11031 Union Hall Street in Jamaica, Queens, New York, and video surveillance had captured two suspects at in the vicinity of three other locations. However, that did not give the state cause to search Mr. Campbell, among the other 6,151 people in these areas, any more than the selling of drugs by "Greg" gave police cause to search the 9-13 patrons the Aurora Tap Tavern in *Ybarra*. To undertake this search police needed to establish "particularized [probable cause] with respect to [each] person" in these areas. Each one of those 6,151 people, including Mr. Campbell, "was clothed with constitutional protection against" the search of their private cellular data. *Id.*

Additionally, the warrant herein failed to utilize either the NDCAC cell site database or appropriate drive testing to identify the coverage area of each antenna in the area. It simply demanded data from cell "towers" that "provide service to" the targeted locations. Utilizing the cell site database or drive testing would not have automatically cured the warrant but both are examples of tools that the government could have used to make the warrant more particularized. A "tower" is a generic term for a cell site. Each cell site is made up of multiple antennae providing service to multiple different areas. So, requesting data for a "tower" as opposed to an antenna or sector is less specific. This is similar to referencing a borough rather than a specific neighborhood, or a neighborhood as opposed to a city block. This is why the cellular providers returned results from multiple antennae likely not serving the area of the crime, leading to such

30

large swaths of Jamaica being swept into the data collected. The appropriate cell site and specific antennae covering the targeted areas could have been identified to limit the needless over seizure found here.

In rejecting an application for a tower dump one court described the problem this way: "If the Court were to issue the warrants, it would be authorizing the Government to search the data for every cellular device (including cell phones) of every single individual near the crime scenes without a showing of probable cause as to each individual." *In re Four Applications*, 2025 WL 603000, at *13. This, the court held, violated the Supreme Court ruling in *Ybarra* and the Fifth Circuit decision in *Smith*. *See id.* at 13-14.

Similarly, in *Spurlock*, the District Court of Nevada found that tower dumps are, as a matter of law, unconstitutional general warrants. *Spurlock*, 2025 WL 1095512 at *7. In *Spurlock* the police were investigating the murder of two individuals found on the side of the road. *Id.* at *3. After discovering the bodies, they found the vehicle of one of the decedents abandoned on a nearby stretch of rural highway. *Id.* at *3-4. Police later obtained a tower dump warrant requesting records from "all cell-sites and their related sectors that cover the immediate area of US highway 395 around mile marker 8.5 and US highway 395 around mile marker 74.5." *Id.* at *3. The warrant also provided "GPS coordinates" (i.e. latitude and longitude). *Id.* at *5. "The 'target of warrant' was listed as, '[a]ny subjects related to an active homicide investigation." *Id*. The decision did not describe the coverage area of the tower dump, but the warrant did produce records that included 1,686 unique devices from the very rural area. *Id.* at *6-7.

The court found that the warrant was a general warrant because it did not name a specific person/device whose data was to be searched "only a temporal and geographic location where any given user may turn up post-search." *Id.* at *12 (citing *Smith,* 110 F.4th at 837). The court explained

that it did not matter that the police later used that data to focus on the defendant because "[a] general warrant cannot be saved simply by arguing that, after the search has been performed, the information received was narrowly tailored to the crime being investigated." *Id.* The court explained "[a]warrant that authorizes the search of anyone who was in a particular area during a particular time range is too permeating police surveillance." *Id.* at *13. For those reasons the court held that the warrant was a general warrant categorically prohibited by the Fourth Amendment. *Id.*

To be sure, there are circumstances where the government need not identify the name of the individual whose information is to be searched and seized. However, courts still require "a particularized description of the person. . ." to be searched. *United States v. Jarvis,* 560 F.2d 494, 497 (2d Cir. 1977) (citing *West v. Cabell*, 153 U.S. 78, 86 (1894)). In other words, law enforcement must be able to "reasonably ascertain and identify the persons or places authorized to be searched and the things…to be seized." *See People v. Nieves,* 36 N.Y. 2d 396, 401 (1975).

Tower dumps like the one issued here do not, in fact cannot, distinguish the search's subject(s) from the general public. Instead, the whole point is to demand private data from everyone in the area of a crime and attempt to identify a suspect later. Such "all persons" warrants are rarely if ever constitutional, requiring "probable cause to believe that all persons on the premises at the time of the search are involved in the criminal activity." *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 276 (4th Cir. 2004); *see also Nieves*, 36 N.Y. at 405. But the warrant application here did there was not even an attempt to suggest that the thousands of New Yorkers to be searched were all implicated in this crime. *See Nieves*, 36 N.Y. at 404-05 (finding that evidence of an individual gambling at a particular restaurant was not probable cause to search all persons at the restaurant); *People v. Mothersell,* 14 N.Y. 3d 358, 363 (2010) ("[T]he requisite probability that anyone at the restaurant would be there for an illicit purpose and would have upon his or her person

32

evidence probative of the alleged ongoing illegality [must be made] out."). Similarly, simply showing that lottery slips were sold in a department store, gas station, or industrial plant would not establish probable cause for all persons present. *See Owens,* 372 F.3d at 275. The "essential object" of the reviewing authority for an all-persons warrant "is to guard against the authorization of a dragnet likely to include the innocent, a danger that would otherwise routinely be courted in issuing all-persons-present warrants." *Id.* at 364. The execution of such a warrant "requires a showing…that it is substantially probable that any persons present at the warrant's execution will have the sought evidence of crime upon them." *Id.* at 365.

As the court described in *In re Four Applications*, with tower dumps the "Government is essentially asking the Court to allow it access to an entire haystack because it may contain a needle." *In re Four Applications*, 2025 WL 603000, at *14. The problem with tower dumps therefore, is both technological and methodological. The technology is not designed to target only those for whom they have established probable cause, and the government is not trying to target only those people—they are seizing "an entire haystack because it may contain a needle." *Id.* at *8. Indeed, the very purpose of tower dump warrants is to dig through the sensitive personal location data of everyone in a geographic area in the hopes that one of them is the suspect. "This is the hallmark of a general warrant – aimless searching with only the hope that the result will justify the means." *Fuentes,* Case No. CR-21-358-RAW at *24. Therefore, the results of this tower dump and any fruits thereof must be suppressed.

### E. The Warrant Application Failed to Establish Probable Cause That Relevant Location History Existed

Probable cause is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause requires a logical connection, or evidentiary nexus between the crime for which probable cause exists and

33

the evidence to be seized, which the government did not demonstrate here. Probable cause must be "grounded in sufficient facts to establish" "fair probability" under *Illinois v. Gates. See United States v. Lauria,* 70 F. 4th 106, 128 (2d Cir. 2023) (finding insufficient probable cause to search CSLI). This means there must be a logical connection or evidentiary nexus between the alleged crime and any phone that is the subject of a warrant.

In *Lauria,* for example, the Second Circuit reviewed warrants "authorizing broad CSLI searches for [defendant's] cell phone records" and found that they were "supported by few facts." *Lauria,* 70 F. 4th at 128. At issue in *Lauria* were a series of robberies and the Court found the following facts from the warrant application to be insufficient to support a search of CSLI:

"(1) [Defendant] is Facebook 'friends' with [co-defendant], and

(2) [Defendant's] cell phone was in communication with [co-defendant's] cell phone…'shortly before' [one of the alleged robberies]."

*Id.* at 129.

In Mr. Campbell's case, the affidavit contained even fewer facts than those found inadequate in *Lauria*, namely, no facts at all. In fact, the tower dump warrant application herein makes note of multiple surveillance cameras on which the robbery suspects, alleged to include Mr. Campbell, were captured shortly after the robbery. *See* Exhibit A, ¶ 8. At no point does the warrant application's brief description of this footage mention any visible cell phones or any of the individuals using a phone. *Id.* Moreover, the description of the robbery at issue also makes no mention of cell phones, either in use, visible at any point, or otherwise connected to the alleged conduct. *Id.* at ¶¶ 6-7. The only items mentioned are "postal keys" and the description of two vehicles. *Id.*

In addition to establishing probable cause that Mr. Campbell was connected to this incident in the first place, in order for a search of Mr. Campbell's cell phone location data to be justified, the government needed to establish probable cause that Mr. Campbell "(1) was carrying his cell phone at the time he committed [the robbery] at issue, such that his phone's location would yield evidence of the [robbery]; or (2) that he somehow used his cellphone at an earlier time in connection with or to facilitate the [robbery]." *United States v. Bertini,* 2023 WL 8258334 at *7 (not reported, discussing *Lauria* at *9). The court in *Bertini* further discussed the "training and experience" justification offered for such a search, as was done in Mr. Campbell's case, and determined that it was insufficient without facts supporting cell phone usage or communication via cell phone about any illegal conduct. *Id.* at *8; *see also* Exhibit A, ¶¶ 10 & 16.

Boilerplate assertions that people use cell phones while committing crimes cannot substitute for a lack of evidentiary nexus between the particular crime for which probable cause exists and the evidence sought, and veers into the territory of an impermissible "hunch." *Lauria,* 70 F. 4th at 129.  The affidavit in this case asserts that "a subject planning a robbery will often use a cell phone immediately before the robbery in order to make plans or to communicate with co-conspirators." Exhibit A, ¶ 10. This generic statement has no application to the facts in this case, where the alleged "co-conspirators" were apparently together during the incident and subsequently all viewed together on surveillance video the entire time. This indicates that they were not communicating via cell phone immediately before or during the robbery because they were together and not viewed to be using cell phones. Any digital communication at a point earlier than this would not be relevant because it would have occurred at some other place outside the scope of this tower dump. While in the bounds of the tower dump, the alleged co-conspirators were together the entire time and not using cell phones. This is confirmed by

35

surveillance video. Yet, the affidavit continues, "[s]imilarly, I know that a subject who has completed a robbery will often use a cell phone immediately after the robbery in order to report to co-conspirators or facilitate escape." *Id.* Again, here, the alleged co-conspirators were seen together on surveillance video in the aftermath of the incident without using phones. The court in *Bertini* noted a similar flaw in the logic of the affidavit therein, in which a comparable, boilerplate "training and experience" claim about co-conspirators communicating via cell phones was included, but the allegations suggested that Mr. Bertini acted entirely alone. *Bertini,* 2023 WL 8258334 at *8. The court found that affidavit's "reliance on circumstances that are not present here" fatal to its required showing of probable cause and "nothing more than the impermissible 'hunch' referenced in *Lauria.*" *Id.* at *9 (citing *Lauria,* 70 F. 4th at 128).

Finally, the affidavit in this case grasps at straws to justify this search with the sparse claim that "a vast majority of people in the United States carry cellular phones with them when they are not at home." Exhibit A, ¶ 16. The *Bertini* court dismissed an identical assertion (justified by the government in that case as "common sense") with a clear disavowal of such logic. "Acknowledging that cell phones have become ubiquitous in our society, a finding of probable cause cannot be premised solely on an agent's assertion that most people carry cell phones most of the time." *Bertini,* 2023 WL 8258334 at *9. If this type of generalization were sufficient for probable cause, the very purpose of warrants would become moot. There would be automatic justification to search anybody with a cell phone at any time.

Therefore, the tower dump warrant application clearly failed to establish probable cause through factual allegations (as required by law) that Mr. Campbell's cell phone location history even existed in relation to this investigation, let alone that it was relevant or contained any probative evidence.

36

### F.  The Good-Faith Doctrine Does Not Apply

The Fourth Amendment's most fundamental restraint is the warrant requirement. In *United States v. Leon*, 468 U.S. 897, 919 (1984), the Supreme Court qualified that restraint where a warrant is based on "objectively reasonable law enforcement activity." But "good faith" "is not boundless" and is inapplicable in four circumstances: (1) where a warrant is based on knowing or recklessly false statements, *id.* at 914 (citing *Franks v. Delaware*, 438 U.S. 154 (1978)); (2) where the judge acted as a rubber stamp for the police, id. (citing *Gates*, 462 U.S. at 288); (3) where a warrant affidavit lacks a substantial basis to determine probable cause, *id.* at 915 (citing *Gates*); and (4) where no officer could reasonably presume the warrant was valid. *Id.* at 923. Indeed, *Leon* should not apply to general warrants at all. However, in the unlikely case that it does, the third and fourth *Leon* exceptions to good faith clearly apply to the tower dump warrant in this case.

The Supreme Court tethered the exclusionary rule to the primary tenets of the Fourth Amendment: particularity, probable cause, and a neutral magistrate who is "not [an] adjunct[] to the law enforcement team." *Id.* at 917, 923. Importantly, the *Leon* good faith exception to the exclusionary rule does not apply to evidence obtained from a warrant that was invalid to begin with.

First, the good faith exception should not apply because the warrant application did not proffer "at least a colorable argument for probable cause."[24] *See Leon* at 915 (third exception);

---

[24] The affidavit in this case simply states, without any nexus to the illegal conduct at issue, that those committing a "robbery will often use a cell phone immediately before [or after] the robbery in order to [communicate] with co-conspirators." *See* Exhibit A, ¶ 10. Moreover, the sole fact that the target suspects were seen using a vehicle is identified as a justification for an all-encompassing sweep of cell phones for thousands of people. *Id.* An affidavit must provide, at least, "'a minimally sufficient nexus' necessitating application of the good faith rule." *See United States v. Sanders,* 106 F.4th 455, 469 (6th Cir. 2024) (internal citation omitted); *supra* n.16.

*United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) ("Absent some limitation curtailing the officers' discretion when executing the warrant, the safeguard of having a magistrate determine the scope of the search is lost"). "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply." *Herring v. U.S.,* 555 U.S. 135, 142 (2009).

Second, the good faith exception should not apply because the warrant was "so lacking in indicia of probable cause" to search for Mr. Campbell's data that it was wholly unreasonable for any objective officer, with even a rudimentary understanding of the Fourth Amendment's requirements, to rely on. *See Leon,* 468 U.S. at 923 (fourth exception).

Police must demonstrate a fair probability that the evidence the police seek will be where they are searching. *See U.S. v. Zemlyansky,* 945 F.Supp.2d 438, 457 (S.D.N.Y. 2013) ("[E]xcessively broad categories of items to be searched for and seized…permits a searching officer to rummage through and seize nearly any conceivable…electronic document. This failing provides an independent basis for deeming the warrant deficient."); *see also Buck,* 813 F.2d at 591 (finding a warrant consisting of "general boilerplate terms, without either explicit or implicit limitation on the scope of the search" impermissibly broad); *United States v. Gonzales,* 399 F.3d 1225, 1230 (10th Cir. 2005) (Rejecting application of the good faith doctrine where the warrant application contained "no facts explaining how the address was linked to Mr. Gonzales, the vehicle, or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence."). That did not happen here. Rather, the affidavit lacked a particularized target and articulated no ex ante probable cause. Neither Mr. Campbell nor any facts about him, or his data and its relevance to the investigation, are present in any part of the tower dump warrant application. Moreover, the Second Circuit has stated that "police officers may [not] invoke the reasonable-reliance exception to the exclusionary rule when they attempt to

38

introduce as evidence the fruits of searches undertaken on the basis of warrants containing only a catch-all description of the property to be seized." *See United States v. Buck,* 813 F.2d 588, 593 at n.2 (2d Cir. 1987).

Additionally, no nexus was ever articulated between the crimes under investigation and cell phone location data to begin with. This certainly does not demonstrate a warrant that would be "reasonably presum[able]" as valid. *Leon*, 468 U.S. at 923.

As such, there is no basis to forgive the bare bones nature of this tower dump warrant, or law enforcement's decision to sidestep traditional means of investigation, such as physical searches for the addresses actually identified, for an unjustified and highly intrusive alternative.

As set forth above, this tower dump was a general warrant, void from its inception and effectively no warrant at all. The warrant not only targets all individuals based on their proximity to a crime, *see supra Ybarra*, 444 U.S. at 91, but also cannot distinguish between responsive and non-responsive data to the crime. It simply seizes all personal data. In *U.S. v. Marti,* this Court found a warrant "direct[ing] the executing officers to seize any materials found…to be in violation of the New York obscenity laws" to be deficient. 421 F.2d 1263, 1268 (2d Cir. 1970). This Court reasoned that "the warrants on their face left to the executing officials the discretion of deciding what materials were obscene" and would be "deficient for failing to describe with particularity the items to be seized." *Id.* Additionally, this Court found that information in the affidavits supporting the warrants did not cure the warrant's deficiency. *Id.*

"[I]t is obvious that a general warrant authorizing the seizure of 'evidence' without [complying with the particularity requirement] is void under the Fourth Amendment" and "is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise." *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992); *see also Groh v. Ramirez,* 540 U.S. 551,

39

563 (2004) ("Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."); *United States v. Leary*, 846 F.2d 592, 607- 09 (10th Cir. 1988) ("reasonably well-trained officer should know that a warrant must provide guidelines for determining what evidence may be seized," and collecting like cases); *United States v. Winn*, 79 F. Supp. 3d 904, 923-24 (S.D. Ill. 2015) (refusing to find good faith where two officers had fifteen years of experience between them and obtained a warrant that "gave them unbridled discretion to search for and seize whatever they wished").

Tower dumps, by design, target all individuals based merely on their proximity to a crime. Like the warrant in *Ybarra*, tower dumps articulate a crime. However, they also authorize the search of private data of everyone in the area of that crime. "A failure to describe the items to be seized with [] particularity…offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *See George*, 975 F.2d 72, 76 (internal citations omitted); *see also Groh*, 540 U.S. 551, 558 ("[T]he warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law.").

Tower dump warrants are general warrants by definition and incompatible with the Fourth Amendment as a matter of law. General warrants must not find harbor in our courts, even if obtained in good faith. Indeed, Courts have never applied the good faith doctrine to excuse general warrants. In *United States v. George*, 975 F.2d at 77, the Second Circuit found that a warrant authorizing the broad seizure of "evidence" without mentioning a crime was a general warrant and therefore "void" under the Fourth Amendment. The court therefore did not apply the good-faith exception and granted suppression. *Id*. at 78; *see also United States v. Winn¸* 79 F.

40

Supp. 3d 904 at 926 (reasoning that "[b]ecause the warrant is a general warrant, it has no valid

portions" and declining to apply the good faith exception). General warrants are not merely

defective—they are anathema to the Fourth Amendment. As the Court has repeatedly

emphasized, the Fourth Amendment was adopted in direct response to the British Crown's use of

general warrants and writs of assistance to conduct indiscriminate searches. *See*, e.g., *Stanford v.

Texas*, 379 U.S. 476, 482 (1965). To now allow such warrants to be excused on the basis of good

faith would invert the very principle the Fourth Amendment was intended to enshrine.

The warrant here stands as a "*paradigmatic* example of 'too permeating police

surveillance' and a dangerous tool of 'arbitrary' authority", *Carpenter,* 585 U.S. at 396

(Gorsuch, J., dissenting) (emphasis in original), posing significant risk to the privacy rights

of New Yorkers. *See Owner Operator Independent Drivers Ass'n, Inc. v. NY State Dept. of

Transportation,* 40 N.Y. 3d 55, 62 (2023).

II.     **Evidence Seized Pursuant to Warrants that Relied on Information Obtained
        Directly or Indirectly from the Tower Dump is Fruit of the Poisonous Tree and
        Should be Suppressed**

All evidence seized from an unconstitutional search should be suppressed. *See Wong Sun*

371 U.S. at 484-88. "The exclusionary rule prohibits introduction into evidence of tangible

materials seized during an unlawful search, and of testimony concerning knowledge acquired

during an unlawful search." *Murray*, 487 U.S. at 536-37 (internal citations omitted). It also

prohibits "the introduction of derivative evidence, both tangible and testimonial, that is the product

of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search,

up to the point at which the connection with the unlawful search becomes 'so attenuated as to

dissipate the taint.'" *Id.* In *United States v. Trzaska*, the Second Circuit clarified that "[e]vidence

seized during an illegal search should not be included in a warrant affidavit." 111 F.3d 1019,

41

1026 (2d Cir. 1997) (citation omitted). It is true that the "mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant." *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citations omitted). Thus, "[A] reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant.'" *Trzaska*, 111 F.3d at 1026 (internal citations omitted).

For a search warrant to properly issue, a neutral and detached magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in an affidavit… there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates* 462 U.S. 213, 238 (1983); *see also United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015).  Whether a search warrant is supported by probable cause turns on whether there is a "substantial basis for... conclud[ing] that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (internal citations omitted).

Because the initial tower dump violated the Fourth Amendment, each subsequent search warrant relying on its fruit must be excised of tainted evidence and reanalyzed for probable cause.

    **A. The May 2, 2024 Warrant Affidavit Supporting the Search of Historical Cell-Site Data is Tainted by Unlawfully Obtained Evidence and is Therefore Void**

        i. <u>Without The Unlawfully Obtained Tower Dump Data, the May 2, 2024 Search Warrant Application Facially Lacked Probable Cause</u>

The government first identified Mr. Campbell in its May 2, 2024 warrant application. There, Postal Inspector He averred that "Records produced by AT&T in response to the Cell Tower Warrant show that [a cell phone belonging to Mr. Campbell] was present at the four dates, times and locations listed above." Exhibit B, ¶ 14. Prior to that search, Mr. Campbell's name did

42

not appear in any warrant application; he was not a suspect, person of interest, or noted to be tangentially connected to this incident. In fact, up until Mr. Campbell was identified through the tower dump, the government was merely investigating "Target Subjects." *See* Exhibit A.

Only after identifying Mr. Campbell through the illegally obtained tower dump records did Inspector He assert that "based on my review of law enforcement databases, I have learned that a dark grey Ford F150" was registered to Mr. Campbell in North Carolina. Exhibit B, ¶ 15. Further investigation resulted in photos of the truck with "a crack next to the driver's side taillight and a defective passenger side taillight with tape over it, consistent with the Grey Ford used during the robbery." *Id.* Inspector He clearly performed this investigation based on knowledge he acquired from the tower dump data. Consequently, paragraphs 14 and 15 of the May 2, 2024 affidavit are tainted and must be excised from the warrant affidavit. *Trzaska*, 111 F.3d at 1026.

Similarly, the witness interview detailed in paragraph 16 of the May 2, 2024 affidavit must be excised as fruit of the poisonous tree. This interview was shaped by and tailored to information that the government obtained illegally. As evidenced by the information contained in the affidavit, officers asked pointed questions about Mr. Campbell, his truck, his connection to the black Mercedes, and his whereabouts on September 2, 2023. *Id.* at 16. Tellingly, officers were primed with a photograph of Mr. Campbell for the purpose of confirming their prior investigation. *Id.* In other words, this was not a general investigative interview but a targeted inquiry, premised in large part on illegally obtained information. Thus, the nature and substance of this interview was an exploitation of unconstitutionally obtained evidence and must be excised from the May 2, 2024 warrant affidavit. *See Wong Sun*, 317 U.S. at 488.

43

Finally, paragraphs 17 through 19 of this warrant affidavit rely entirely on the results of the tower dump. Exhibit B, ¶¶ 17-19. Applying the *Trzaska* framework, the Court must excise all tainted evidence from the warrant affidavit and perform a probable cause analysis on what remains. 111 F.3d at 1026.

Once excised of tainted evidence, what remains in the May 2, 2024 affidavit does not establish probable cause that Mr. Campbell committed the robbery. Instead, the remainder of Inspector He's affidavit includes the basic facts of the robbery, such as the location, suspect descriptions, and the identification of a grey Ford pickup truck used during the commission of the crime, Exhibit B, ¶¶ 6-9, and information regarding the black Mercedes and related license plate reader data. *Id.* at ¶¶ 11-12. None of this evidence links Mr. Campbell to the robbery. Accordingly, the affidavit does not demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place" and suppression is warranted. *Gates*, 462 at 238.

ii. <u>The Government Failed to Establish a Nexus Between the Alleged Crime and Mr. Campbell's Cell Phone</u>

"Training and experience" cannot support probable cause to search Mr. Campbell's phone records and data. *See supra* Section I(E). The Second Circuit has clarified that a "law-enforcement affiant's claim to expertise may support a probable-cause determination where it is *combined with enough other specific, factual allegations* that tend to link the alleged criminal conduct to the place to be searched." *United States v. Silva*, 146 F.4th 183, 190 (2d Cir. 2025) (emphasis added). In *Silva*, the court found probable cause to search a cell phone based on a warrant application alleging racketeering-conspiracy, membership in a gang, wire fraud and digital financial crimes where the agent "identified particular attributes" of the alleged crimes that supported a reasonable inference that his cell phone would have evidence of those crimes. *Id.* at 186. Further, the court noted that "it matter[ed] that the alleged offense here—gang

44

violence, financial crimes, and flight from justice—can be evinced and manifested electronically in many ways." *Id.*

Here, Inspector He relied on "training and experience" to assert that those involved in robberies often use cell phones. Exhibit B, ¶ 20. But he did not identify any meaningful facts suggesting a cell phone was used here. That "two Target Subjects were observed on video surveillance exiting from and reentering into the passenger side of the Grey Ford" does not suggest use of a cell phone or, as the affidavit claims, "indicate that at least one other co-conspirator assisted them" through use of a cell phone. *Id.* at ¶ 20. In fact, this shows that the suspects were together for the duration of the crime, without any need for electronic communication. Finally, the affidavit asserts that "exiting from the Grey Ford and entering the Black Mercedes… demonstrates prior coordination and planning." *Id.* This unsupported and overbroad claim, without more, does not satisfy *Silva* and cannot support "a fair probability that contraband or evidence of a crime will be found" on any phone, let alone Mr. Campbell's. *Gates*, 462 at 238.

For those reasons, all evidence seized pursuant to the May 2, 2024 search warrant should be suppressed.

### B. The February 11, 2025 Warrant for Prospective Cell-Site Location Information is Tainted by Unlawfully Obtained Evidence and is Therefore Void

Mr. Campbell incorporates by reference the factual and legal arguments made above regarding the suppression of the 2666 number's historical cell site data seized pursuant to the May 2, 2024 search warrant. *See supra* Part II(A)(i). Those same arguments apply to the suppression of evidence here. In particular, Inspector He's affidavit impermissibly relied upon tainted evidence seized pursuant to the invalid September 19, 2023 and May 2, 2024 search

45

warrants, i.e., the tower dump and AT&T returns for Mr. Campbell's 2666 number. *See* Exhibit C.

Once the tainted evidence is excised from the government's February 11, 2025 warrant application as the Second Circuit requires, *Trzaska*, 111 F.3d at 1026, the remaining affidavit fails to establish probable cause to search Mr. Campbell's prospective cell-site location information. Unlike previous applications, this affidavit incorporated evidence from the Complaint into its "Probable Cause" section. Exhibit C, ¶ 8. Although the resulting affidavit still relies overwhelmingly on tainted evidence, certain additions warrant discussion.

In compiling the Complaint, Inspector He reviewed law enforcement records and body worn camera footage of an unrelated incident involving Mr. Campbell on October 13, 2023. There, NYPD officers stopped Mr. Campbell while he drove a Honda Accord with "excessive window tints and South Carolina temporary paper license plates numbered 5498869." *Id.* at ¶ 16. After discovering that Mr. Campbell's license was suspended, officers searched the vehicle and found a second temporary South Carolina plate in the trunk with the same license plate number. *Id.* Additionally, that plate "bore a VIN that was one digit off from the VIN of the Grey Ford, and is consistent in appearance with the temporary license plate captured on the MTA bus video." *Id.* Ultimately, this evidence is fruit of the poisonous tree and cannot be used to establish probable cause.

Without identifying Mr. Campbell through the tower dump data and historical cell site location information, Inspector He would have had no reason to investigate the arrest records and body-worn camera footage from the October 13, 2024 arrest. Complaint, ¶ 16. All evidence connecting the license plate found in Mr. Campbell's Honda to the alleged crime is fruit of the poisonous tree and cannot be used to establish probable cause.

46

Further, the MTA video surveillance did not, as the Complaint suggests, independently establish that the Grey Ford used in the robbery bore a temporary plate numbered 5498869. *See* Complaint, ¶ 13. No prior affidavit included this claim despite relying on the same footage. *See* Exhibit B, ¶ 9. Prior affidavits reported only that "surveillance footage… shows that the Grey Ford had a crack next to the driver's side taillight and a defective passenger side taillight with tape over it," with no mention of a plate number. If a plate number were discernible, as the Complaint claims, it would have appeared in the May 2, 2024 affidavit referencing the same footage. Indeed, the May 2, 2024 affidavit specified that the same footage showed "the Black Mercedes, which has New York License Plate Number KZZ9901, being followed by the Grey Ford." Exhibit B, ¶ 10. That omission is significant and underscores the central role tainted evidence played here.

With that, the February 11, 2025 search warrant affidavit does not offer evidence that rises to the level of probable cause linking Mr. Campbell to the robbery on September 2, 2023. For those reasons, suppression of all evidence seized pursuant to the February 11, 2025 search warrant for Mr. Campbell's prospective cell-site location information is warranted.

### C. The March 24, 2025 Warrant to Search Two iPhones Seized During Mr. Campbell's Arrest is Tainted by Unlawfully Obtained Evidence and is Therefore Void.

Mr. Campbell incorporates by reference the factual and legal arguments made regarding the suppression of evidence seized pursuant to the warrants predating the March 24, 2025 warrant. *See supra* Part II(A)&(B). Inspector He impermissibly relied on tainted evidence in his March 24, 2025 warrant affidavit. That affidavit relied on evidence seized pursuant to the invalid September 19, 2023 and May 2, 2024 search warrants, i.e., the tower dump and AT&T returns. *See* Exhibit D.

47

Once the tainted evidence is excised from the government's March 24, 2025 search warrant application, the remaining affidavit offers nothing more with regard to Mr. Campbell. No evidence connects Mr. Campbell to the alleged crime and no assertions connect the crime to the contents of Mr. Campbell's iPhones. *See supra* Part II(A)(ii). As a result, this affidavit does not establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 at 238. For those reasons, this Court should suppress all evidence seized from Mr. Campbell's iPhones pursuant to the government's March 24, 2025 search warrant.

### D. The May 16, 2025 Warrant for Data From Mr. Campbell's Apple Accounts is Tainted by Unlawfully Obtained Evidence and is Therefore Void.

Mr. Campbell incorporates by reference the factual and legal arguments made regarding the suppression of evidence seized pursuant to the warrants predating the May 16, 2025 warrant. *See supra* Part II(A), (B), & (C). Inspector He impermissibly relied upon tainted evidence in his May 16, 2025 affidavit in support of probable cause. That affidavit relied on evidence seized pursuant to the invalid September 19, 2023, May 2, 2024, and March 24, 2025 search warrants, i.e., the tower dump, AT&T returns, and iPhones. *See* Exhibit E.

Once the tainted evidence is excised from the government's May 16, 2025 search warrant application, the remaining affidavit offers nothing more with regard to Mr. Campbell. It offers no evidence that rises to the level of probable cause linking Mr. Campbell to the robbery on September 2, 2023 and makes no factual assertions connecting the crime to Mr. Campbell's Apple account data. *See supra* Part II(A)(ii). As a result, this affidavit does not establish "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 at 238.  For those reasons, suppression of all evidence seized pursuant to the government's May 16, 2025 search warrant for data related to Mr. Campbell's Apple account is warranted.

## CONCLUSION

For the reasons set forth in this brief, the tower dump warrant was an invalid general warrant. All evidence seized pursuant to the tower dump warrant and subsequent warrants should be suppressed. In the alternative, Mr. Campbell requests a hearing to resolve any questions of fact.

_____
Charles Millioen
Attorney for Mahwanga Campbell
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201
charles_millioen@fd.org


cc:    AUSA Russell Noble (by ECF and E-mail)
       Chambers of the Hon. Eric N. Vitaliano (by E-mail)