UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ x
UNITED STATES OF AMERICA,                       :
                                                :
              -against-                          :
                                                :        MEMORANDUM & ORDER
MAHWANGA CAMPBELL,                               :
                                                :        25-CR-218 (ENV)
                          Defendant.             :
------------------------------------------------------------ x
```

VITALIANO, D.J.

On July 2, 2025, a grand jury returned an indictment charging defendant Mahwanga Campbell with the following offenses: (1) conspiracy to rob a mail carrier, in violation of 18 U.S.C. § 371; (2) robbery of a mail carrier, in violation of 18 U.S.C. § 2114(a); (3) theft of a United States Postal Service ("USPS") key, in violation of 18 U.S.C. § 1704; and (4) assaulting a federal employee, in violation of 18 U.S.C. § 111. Six months later, on January 20, 2026, three more counts—(5) possession of stolen mail, in violation of 18 U.S.C. § 1708; (6) theft of government property, in violation of 18 U.S.C. § 641; and (7) bank fraud, in violation of 18 U.S.C. § 1344— were added in a superseding indictment. Now, in accordance with Federal Rule of Criminal Procedure 12(b)(3)(C) and the Fourth Amendment, Campbell moves to suppress the evidence obtained via a "tower dump" warrant and the fruits of any search authorized as a result of the evidence obtained from the execution of the tower dump warrant. He also moves, pursuant to Rules 12(b)(3)(B)(iv) and 12(b)(3)(D), to sever Count Six (theft of government property) and Count Seven (bank fraud). Both motions are denied for the reasons that follow.

## Background[1]

On September 2, 2023, a USPS mail carrier was delivering mail near 110-29 Union Hall

---

[1] The background facts are principally drawn from the complaint, the superseding indictment, and

1

Street in Queens when he passed by a gray Ford pickup truck.  Compl., Dkt. No. 1, at ¶¶ 5-6.  As he was walking past the truck, two men jumped out from the passenger side and attacked him.  *Id.* ¶ 6.  One of the men threw him to the ground and grabbed him by the leg, while the other one snatched his "arrow key."  *Id.*  USPS arrow keys are master keys that give mail carriers access to various USPS mail receptacles, such as relay boxes and apartment panel boxes, within a delimited geographic area.[2]  Superseding Indictment, Dkt. No. 23, at ¶ 5.

Once the pair had grabbed the arrow key, they hopped back into the truck, which promptly took off.  Compl. ¶ 8.  The Ford was then driven towards 90-23 171st Street in Jamaica, Queens, where it stopped behind a black Mercedes sedan.  *Id.* ¶ 9.  Two men, one of whom had not joined physically in the ambush of the mail carrier earlier, left the Ford and talked for a short while.  *Id.* ¶¶ 10-11.  The one who had stayed behind during the robbery had been the Ford's driver; he was later identified as Mahwanga Campbell, the defendant in this case.  *Id.* ¶ 10.  Campbell then walked over to the Mercedes, while the other man, the one who had made physical contact with the mail carrier during the robbery, returned to the Ford.  *Id.* ¶ 11.  Joined by another individual who had not been in the Ford, Campbell entered the Mercedes, and the Mercedes and the Ford departed the scene together.  *Id.*

Between September 2023 and June 2024, Campbell, along with his compatriots, allegedly used the stolen arrow key to pilfer checks from USPS mail receptacles around Queens, including checks issued by the U.S. Treasury on behalf of different federal government agencies.  Superseding Indictment ¶ 6.  With the checks in hand, Campbell then allegedly, between April 2024 and July 2024, deposited four stolen or falsified U.S. Treasury checks into bank accounts he

---

the exhibits attached to Campbell's motion papers.  The accuracy (or not) of the allegations against Campbell is not at issue here, and the veracity of the exhibits is undisputed.

[2] Postal workers use relay boxes to store mail bags while completing their routes.  Compl. ¶¶ 2-3.

controlled. *Id.* ¶¶ 3, 7. The total approximate value of these four checks was $16,865.87. *Id.* ¶ 7.

In the immediate aftermath of the robbery, on September 19, 2023, the government obtained a "tower dump" warrant. Ex. A, Dkt. No. 25-1, at 12. Tower dumps involve the "download of information on all the devices that connected to a particular cell site during a particular interval." *Carpenter v. United States*, 585 U.S. 296, 316 (2018). Here, the government, pursuant to a search warrant issued by Magistrate Judge Cheryl L. Pollak, directed four cellular service providers (AT&T, Verizon, T-Mobile, and Sprint) to hand over the location data, also referred to as cell-site location information ("CSLI"), for every device that connected to cell towers servicing four addresses in Jamaica, Queens over an approximately 35-minute period on September 2, 2023. Ex. A at 12, 14-16. Using information gleaned from the tower dump, the government then sought, and obtained, four additional warrants for: (1) historical CSLI for three phone numbers, including Campbell's; (2) prospective CSLI and a pen register for Campbell's number; (3) the two iPhones found on Campbell at the time of his arrest; and (4) Campbell's two iCloud accounts. Ex. B, Dkt. No. 25-2; Ex. C, Dkt. No. 25-3; Ex. D, Dkt. No. 25-4; Ex. E, Dkt. No. 25-5.

Standard of Review

Under Federal Rule of Criminal Procedure 12(b)(3)(C), a defendant may make a pretrial motion to suppress evidence pursuant to the Fourth Amendment. Fed. R. Crim. P. 12(b)(3)(C). "The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures' and prohibits the issuance of warrants without 'probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. Jones*, 43 F.4th 94, 108 (2d Cir. 2022) (quoting U.S. Const. amend. IV). The Founders drafted the Fourth

Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *Jones*, 43 F.4th at 108 (quoting *Lange v. California*, 594 U.S. 295, 301 (2021)) (internal quotation marks omitted). "Searches conducted pursuant to . . . warrants are presumptively reasonable." *United States v. Lauria*, 70 F.4th 106, 120 (2d Cir. 2023).

Criminal defendants may also move, under the Federal Rules of Criminal Procedure, to sever counts charged in the same indictment due to improper or prejudicial joinder. Fed. R. Crim. P. 12(b)(3)(B)(iv), 12(b)(3)(D). Joinder of offenses is proper, in accordance with Rule 8(a), "if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). But, even if joinder is proper, severance may still be warranted if joinder would unfairly prejudice the defendant. Rule 14(a) authorizes courts to "order separate trials of counts . . . or provide any other relief that justice requires" if such circumstances arise. Fed. R. Crim. P. 14(a).

Discussion

I.    Motion to Suppress

Campbell moves to suppress the evidence obtained from a tower dump warrant and its fruits. He argues that *Carpenter v. United States*, the Supreme Court case that held that commanding cellular service providers to turn over individual historical CSLI constitutes a Fourth Amendment search, ought to be extended to tower dumps and that the government's acquisition of the tower dump data here should accordingly be deemed a Fourth Amendment search that necessitated a warrant. *Carpenter*, 585 U.S. at 316. He further claims that the government is not

4

saved by the fact that it did apply for and procure a warrant here, as the "warrant" in question amounted to nothing more than an unconstitutional general warrant.  Neither of Campbell's contentions need be addressed though, as this motion can be resolved entirely on the basis of the good-faith exception to the exclusionary rule.[3]

Suppression has "always been [a] last resort, not [a] first impulse."  *United States v. Purcell*, 967 F.3d 159, 179 (2d Cir. 2020) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)) (internal quotation marks omitted).  Because the "exclusionary rule is a 'judicially created' doctrine," it "applies 'only where its deterrence benefits outweigh its substantial social costs.'" *Jones*, 43 F.4th at 110 (first quoting *Herring v. United States*, 555 U.S. 135, 139 (2009); and then quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)).  "The extent to which the exclusionary rule is justified by deterrence principles varies with the culpability of the law enforcement conduct."  *Id.* (quoting *Herring*, 555 U.S. at 143) (internal quotation marks omitted).  "[W]hen an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, in most cases, there is no police illegality and thus nothing to deter."  *Purcell*, 967 F.3d at 179 (quoting *United States v. Leon*, 468 U.S. 897, 920-21 (1984)) (internal quotation marks omitted).  Suppression is therefore unwarranted under such circumstances.

While "most searches conducted pursuant to a warrant . . . fall within [the] protection" of the good-faith exception, the Supreme Court has recognized four circumstances where the exception does not apply: (1) "where the issuing magistrate has been knowingly misled"; (2) "where the issuing magistrate wholly abandoned his or her judicial role"; (3) "where the

---

[3] Yesterday, the Supreme Court decided the case *Chatrie v. United States*, 609 U.S. ----, 2026 WL 1855568 (June 29, 2026), which, though deciding that the fruits of a geofence warrant are the fruits of a search within the meaning of the Fourth Amendment, does not affect in any way the Court's ruling on Campbell's motion to suppress the fruits of the tower dump warrant executed in this case.

application is so lacking in indicia of probable cause as to render reliance upon it unreasonable";
and (4) "where the warrant is so facially deficient that reliance upon it is unreasonable." *United
States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. Moore,* 968 F.2d 216,
222 (2d Cir. 1992)) (internal quotation marks omitted).  Campbell asserts only the third and fourth
carve-outs to the good-faith exception.  Neither is applicable here.

A bit of historical context will be helpful to an understanding of the Court's determination.
When the USPS postal inspectors investigating the robbery initially submitted their application for
the tower dump warrant on September 19, 2023, tower dumps, although not uncommon, were still
relatively novel.  Widespread adoption of cell phones had only taken off about two decades before
then, and most cell tower litigation centered on not-in-my-backyard disputes over their location.
Instructively, courts tend to be reluctant to suppress evidence gathered using cutting-edge
investigative techniques like this one, *see, e.g.*, *United States v. Spurlock*, 778 F. Supp. 3d 1136,
1148 (D. Nev. 2025), and other novel-at-the-time techniques, *see, e.g.*, *United States v. Eldred*,
933 F.3d 110, 111, 119-20 (2d Cir. 2019) (a search program able to "circumvent the anonymizing
features of the dark web").

Indeed, there was little judicial precedent that the postal inspectors could turn to for
guidance at the time.  The Supreme Court had expressly declined to voice a view as to the
constitutionality of tower dumps in *Carpenter*.  *Carpenter*, 585 U.S. at 316.  In the years that
followed, lower courts were slow to pick up the slack, and decisions on the legality of tower dumps
were few and far between.  In fact, prior to the time the warrant challenged here was granted, there
was only one (unpublished) decision in the Second Circuit on this issue—and, on facts analogous
to those in this case, it had flatly rejected the defendant's challenge to the tower dump warrant.
*See United States v. Morris*, No. 20-CR-100-RJA-JJM, 2022 WL 1651408, at *10-11 (W.D.N.Y.

6

Apr. 12, 2022), *report and recommendation adopted*, 2022 WL 1645261 (W.D.N.Y. May 24, 2022).  Moreover, out-of-circuit decisions at the time were, for the most part, fully in accord.  *See, e.g.*, *Matter of Search of Info. Associated with Cellular Tel. Towers Providing Serv. To [Redacted] Stored at Premises Controlled by Verizon Wireless*, 616 F. Supp. 3d 1 (D.D.C. 2022) (granting warrant application); *Matter of Tower Dump Data for Sex Trafficking Investigation*, No. 23 M 87, 2023 WL 1779775 (N.D. Ill. Feb. 6, 2023) (same); *United States v. James*, 3 F.4th 1102 (8th Cir. 2021) (affirming denial of motion to suppress).  With such a track record of success in the courts, the postal inspectors in this case can hardly be faulted for believing themselves to be in the clear when they made their own request for tower dump data.

With that groundwork in place, each of Campbell's arguments for applying the carve-outs to the good-faith exception can now be disposed of in turn.  To begin, the tower dump warrant application was not so lacking in indicia of probable cause, or so "bare bones," as to render reliance upon the warrant unreasonable.  Proving that warrant applications are "bare bones," such that "they are totally devoid of factual circumstances to support conclusory allegations," is "a very difficult threshold" to cross—and Campbell has not succeeded in his quest to do so.  *Jones*, 43 F.4th at 112 (first quoting *Clark*, 638 F.3d at 103; and then quoting *United States v. Falso*, 544 F.3d 110, 128 n.24 (2d Cir. 2008)) (internal quotation marks omitted).

Courts treat probable cause as "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  *Clark*, 638 F.3d at 94 (quoting *Illinois v. Gates,* 462 U.S. 213, 232 (1983)) (internal quotation marks omitted).  Probable cause to search exists "where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.* (quoting *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir. 2007)) (internal quotation marks omitted).

Though, to sustain a finding of probable cause, an "officer's affidavit in support of a warrant must establish[] a sufficient nexus between the criminal activities alleged and [the place to be searched]," a "showing of nexus does not require direct evidence" but may instead "be based on [a] reasonable inference from the facts presented based on common sense and experience." *United States v. Silva*, 146 F.4th 183, 189 (2d Cir. 2025) (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)) (internal quotation marks omitted).

On the whole, enough factual allegations are set forth in the affidavit supporting the tower dump warrant application, evincing a fair probability that sufficient evidence of the robbery of the USPS worker would be found on the CSLI collected in the tower dump, to carry the warrant that secured it across the finish line for purposes of the good-faith exception.  To establish probable cause, the affidavit had to show that the CSLI, aggregated from the four cellular service providers designated in the warrant and taken as a whole, might reveal "relevant evidence of the alleged crimes"—in this case, the identities of the suspects. *Silva*, 146 F.4th at 190.  To do so, the affidavit did not need to contain any "[a]llegations tending to show that the target[s] used [their] cell phone[s] in furtherance of criminal conduct," although such allegations would have been helpful. *Id.*  Instead, it only had to demonstrate a fair probability that the culprits were carrying their cell phones when they committed the robbery, which would be enough to generate CSLI that could tie them to the scene of the crime. *See Carpenter*, 585 U.S. at 300-01 ("Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features.").[4]

---

[4] The fact that cell phones constantly produce CSLI is well-documented by information readily accessible in the public domain. *See, e.g.*, Lars Daniel, *How Digital Forensics Experts Know Where You've Been—Cell Site Location Information*, Forbes (Dec. 18, 2024), https://www.forbes.com/sites/larsdaniel/2024/12/18/how-digital-forensics-experts-know-where-youve-been-cell-site-location-information/.

To that end, the affidavit offers two sets of pertinent factual allegations.  First, the affiant, Postal Inspector Steven He, submits that the majority of Americans, including New Yorkers, "carry cellular phones with them when they are not at home."  Ex. A at 5, 7.  That is a "blanket generalization[]" untethered to the specific facts of this case and cannot suffice to establish probable cause on its own.  *United States v. Bertini*, No. 23 Cr. 61 (PGG), 2023 WL 8258334, at *9-10 (S.D.N.Y. Nov. 29, 2023).  Though true that Americans tend to "compulsively carry cell phones with them all the time," *Carpenter*, 585 U.S. at 311, a cell phone is not (yet) an actual bodily appendage and could be left at home unless there is a reason to take it along.

Second, and more compellingly, Postal Inspector He attests that, based on his experience and training, "individuals who conspire to commit robberies frequently communicate with one another to plan and execute their crimes" using cell phones and therefore likely have their phones on them during the robberies.  Ex. A at 6.  "[A] law-enforcement affiant's claim to expertise may support a probable-cause determination where it is combined with enough other specific, factual allegations that tend to link the alleged criminal conduct to the place to be searched."  *Silva*, 146 F.4th at 190.  Postal Inspector He does exactly that in his sworn statement of facts, giving multiple corroborating details.  He states, for one, that there was more than one perpetrator involved in the robbery.  Ex. A at 3-4.  Beyond that, he describes how the suspects switched from one get-away vehicle to another while fleeing, thereby indicating a high level of coordination among the accused robbers.  *Id.* at 4-5.  Contrary to what Campbell claims, it is immaterial that surveillance cameras did not capture any footage of the suspects using cell phones or that the two suspects identified in the affidavit seem to have stayed together during their escape.  Probable cause determinations do not demand certainty, only a "fair probability."  *Lauria*, 70 F.4th at 128.  Overall, the affidavit encapsulates sufficient indicia of probable cause, based on the allegations outlined above, to

9

survive a good-faith analysis and ratify the issuance of the warrant.

Yet, there are other barriers for an otherwise valid warrant to overcome. As to one of those barriers, Campbell's motion tests whether the tower dump warrant was so facially deficient in its failure to particularize the place to be searched and the things to be seized that the postal inspectors' reliance upon it was unreasonable. The Fourth Amendment's particularity requirement "limit[s] the authorization to search to the specific areas and things for which there is probable cause to search . . . [to] ensure[] that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Purcell*, 967 F.3d at 178. To satisfy the requirement, "a warrant must meet three criteria: (1) it 'must identify the specific offense for which the police have established probable cause'; (2) it 'must describe the place to be searched'; and (3) it 'must specify the items to be seized by their relation to designated crimes.'" *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013)). The inquiry, however, is not a numbers game focused on the size of the pool of materials seized pursuant to the warrant. Simply stated, because a warrant is broad in scope does not mean it lacks particularity. *Id.* at 179. "[I]n many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast." *Id.* (quoting *United States v. Ulbricht*, 858 F.3d 71, 100 (2d Cir. 2017)) (internal quotation marks omitted). But a warrant will be deemed defective "if it is broader than can be justified by the probable cause upon which the warrant is based." *Id.* (quoting *Galpin*, 720 F.3d at 446) (internal quotation marks omitted).

Instead of permitting USPS postal inspectors to engage in the sort of general rummaging frowned upon by the Founders, the tower dump warrant here satisfied each of the three components of the particularity requirement. First, it identified 18 U.S.C. § 2114 (robbery of a mail carrier) as the offense for which probable cause existed; second, it described the place to be searched as the

10

four cellular service providers' respective archives of communications records for the locations and times listed in the warrant; and third, it specified the items to be seized as the information constituting evidence of violations of 18 U.S.C. § 2114, namely the data for phones that connected to the identified cell towers at more than one of the designated times. Ex. A at 14-16. Though sweeping in its ambit, moreover, the warrant was not, at least for purposes of this good-faith analysis, overbroad. In an effort to guarantee that no more data was collected than necessary to identify the perpetrators of the robbery, the scope of the warrant was tailored to the events under investigation. In the first place, the warrant only ordered the cellular service providers to hand over CSLI, and not the contents of any communications. *Id.* at 15. In addition, it imposed geographic and temporal constraints on the CSLI to be seized. Specifically, it limited the government to seizing the CSLI for those phones that registered with cell towers servicing four street intersections or addresses during the five-to-ten-minute intervals when the suspects were observed on security cameras at those locations. *Id.* at 14. Lastly, the warrant restricted the seizure to the CSLI for those phones that connected at least twice to the identified cell towers. *Id.* at 16.

Certainly, the warrant could have been more exacting in its specificity. Using databases available to the government, it likely could have narrowed in on the sectors or antennae of the cell towers that exclusively covered the target areas, as opposed to requesting data from the cell towers writ large. It could also have instituted clearer protocols for handling non-responsive data. As written, the warrant directed the cellular service providers to disclose *all* the CSLI that met its geographic and temporal parameters; only after the postal inspectors received all of that CSLI was the "seizure" then further restricted to the CSLI for those phones that made more than one connection to the cell towers. *See* Ex. A at 15-16. Of course, with additional reflection, the warrant could have instructed the cellular service providers to only turn over the smaller set of CSLI to

11

begin with. Or it could have, at least, set out a detailed plan for segregating the non-responsive CSLI once it was in the hands of the postal inspectors. The fact that the tower dump warrant could have been more particularized strongly suggests that going forward they must be. But, even though the government did not follow what, given a more traveled landscape, are now likely deemed best practices, the standard set by the good-faith exception is a forgiving one, and modest missteps by the government like these cannot serve as a basis for suppression. *See United States v. Sherod*, No. SAG-24-0120, 2025 WL 1736279, at *6-7 (D. Md. June 23, 2025).

Nor does the Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85 (1979), which Campbell relies upon heavily in his motion, counsel in favor of suppression. In *Ybarra*, based on a tip from an informant that a bartender was selling heroin, an Illinois state judge issued a warrant to search the bartender and the tavern at which he was employed for evidence of controlled substances. *Ybarra*, 444 U.S. at 87-88. When executing the warrant, the police also searched the tavern's patrons and, upon frisking one of the customers, discovered tinfoil packets of heroin on his person. *Id.* at 88-89. The Supreme Court ruled that this search violated the Fourth Amendment because "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* at 91, 96.

*Ybarra* is plainly distinguishable. In *Ybarra*, the affidavit in support of the search warrant "did not allege that the bar was frequented by persons illegally purchasing drugs," and "[i]t did not state that the informant had ever seen a patron of the tavern purchase drugs." *Ybarra*, 444 U.S. at 90. The scope of the search warrant, to the extent that it purported to authorize a search of the tavern's customers, therefore outran the probable cause upon which it was based. No such mismatch between probable cause and breadth exists in this case. To identify the robbery suspects, it was necessary to search, at least glancingly through their CSLI, a wide-ranging pool of

12

individuals, as was shown above.

Many courts, working through similar fact patterns, have also rejected probable cause and particularity challenges to tower dump warrants. *See, e.g.*, *James*, 3 F.4th at 1105-06; *Sherod*, 2025 WL 1736279, at *4-6; *United States v. McCracken*, No. 24-3-1, 2, 3, 4, 5, 2025 WL 3034953, at *8-10 (E.D. Pa. Oct. 30, 2025); *United States v. McDonald*, 816 F. Supp. 3d 150, 158-59 (D. Mass. 2026). This Court, at least in the context of a good-faith analysis, now joins them. Because the postal inspectors who executed the tower dump warrant acted in objectively reasonable reliance on the warrant, the fruits of the tower dump and the subsequent warrants will not be suppressed.

## II.      Motion to Sever

Rule 8(a) sets forth a "liberal standard for joinder of [criminal] offenses." *United States v. Wilson*, 512 F. App'x. 75, 76 (2d Cir. 2013). In general, "[j]oinder is proper where the same evidence may be used to prove each count or if the counts have a sufficient logical connection." *United States v. Page*, 657 F.3d 126, 129 (2d Cir. 2011) (first quoting *United States v. Blakney,* 941 F.2d 114, 116 (2d Cir. 1991); and then quoting *United States v. Ruiz,* 894 F.2d 501, 505 (2d Cir. 1990)) (internal quotation marks and citations omitted). Courts, as a rule, take a "common sense approach" when weighing the propriety of joinder. *United States v. Kaplan*, No. 23-cr-00293-JMA-JMW, 2025 WL 2200539, at *9 (E.D.N.Y. Aug. 1, 2025) (quoting *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003)) (internal quotation marks omitted).

Though the general rules governing the propriety of joinder are indisputable, the parties disagree as to what materials can be considered for purposes of the analysis. Campbell, on the one hand, contends that courts, when determining the propriety of joinder, ought to be restricted to the allegations contained in the indictment. Meanwhile, the government has taken the opposite stance, offering up a number of exhibits to supplement the indictment. The Second Circuit, for its part,

13

has not spoken directly to the issue.  It has, however, observed previously that inquiries into the propriety of the joinder of defendants, which is controlled by Rule 8(b), should be limited to the four corners of the indictment.  *United States v. Rittweger*, 524 F.3d 171, 178 & n.3 (2d Cir. 2008).  It reached this conclusion in light of the rule's textual emphasis on the "indictment."  *See id.*  Given the close similarity in language between Rules 8(a) and 8(b), it would seem natural to conclude that the same tenet should hold true in the context of Rule 8(a).  Yet, on multiple occasions in the past, the Second Circuit has taken extrinsic evidence into account when reviewing Rule 8(a) motions simply as a matter of course and without any discussion whatsoever.  *See, e.g.*, *United States v. Litwok*, 678 F.3d 208, 216-17 (2d Cir. 2012); *United States v. Scali*, 820 F. App'x. 23, 27 (2d Cir. 2020).  The matter therefore remains unsettled.

Regardless, even if the inquiry at hand were confined to the face of the indictment, joinder would be appropriate.  The conduct charged in Counts Six and Seven, concerning the four U.S. Treasury checks deposited into Campbell's bank accounts, forms part of a "common scheme or plan" with the robbery of the mail carrier that sits at the center of the first five counts.  Fed. R. Crim. P. 8(a).  To be sure, the indictment is no geometry proof.  It does not, step by step, explain the exact relationship between the theft of the arrow key and the acquisition of the four checks.  But it does allege, albeit in separate sections, that: (1) Campbell was using the arrow key to steal U.S. Treasury checks; and (2) that the four checks he deposited were U.S. Treasury checks.  Superseding Indictment ¶¶ 6-7.  The natural implication is that the two allegations are connected and that at least some of the four checks were taken by means of the arrow key.  This logical link is further bolstered by a temporal connection among the counts charged.  The dates mentioned in the indictment overlap, with Campbell allegedly using the arrow key to steal mail between September 2023 and June 2024 and Campbell then going on to deposit the fraudulent checks

between April 2024 and July 2024.  *Id.*  The textual nexus laid out in the indictment is undeniable, meaning that there is no need to refer to the government's supplementary documents before concluding that joinder is proper under Rule 8(a).

Still, even when "distinct offenses have been properly joined under Rule 8, [a] court may order separate trials or grant a severance under Rule 14 if it appears that the defendant is prejudiced by the joinder." *United States v. Sampson*, 385 F.3d 183, 190 (2d Cir. 2004) (quoting *United States v. Werner,* 620 F.2d 922, 928 (2d Cir. 1980)) (internal quotation marks omitted).  "Because Rule 8 joinder inherently 'authorizes some prejudice,' a defendant who 'seeks separate trials under Rule 14 carries a heavy burden of showing that joinder will result in substantial prejudice.'"  *Kaplan*, 2025 WL 2200539, at *9 (quoting *United States v. Amato*, 15 F.3d 230, 237 (2d Cir. 1994)).  Thus, "the defendant must show that unfair prejudice resulted from the joinder, not merely that he 'might have had a better chance for acquittal at a separate trial.'"  *Page*, 657 F.3d at 129 (quoting *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir. 1978)).

Joinder would not be nearly prejudicial enough to warrant severance under Rule 14 here. Campbell's efforts to prove otherwise are unavailing, especially given that evidence of the robbery would likely be admissible in any trial on the bank fraud, and vice versa, as prior bad act evidence offered for a non-propensity purpose under Federal Rule of Evidence 404(b).  *See Kaplan*, 2025 WL 2200539, at *13 (finding no undue prejudice under similar circumstances).  For example, at a trial on the bank fraud charges, evidence of the robbery could be admitted to show that Campbell possessed the means, in the form of a USPS arrow key, to unlock mailboxes and steal the checks stored in the mail bags inside.  On the flip side, evidence of the bank fraud could help establish Campbell's motivation for swiping the arrow key at a trial for the robbery.  Seeing as how in each case the respective juries would hear all the evidence anyway, trying Campbell on all of the charges

15

at once can hardly be prejudicial.

With Campbell having failed to make any showing of substantial prejudice by the joinder of Counts Six and Seven with the others charged in the superseding indictment, a Rule 14(a) severance is unwarranted and will not be ordered. Nor is there a need at this time to resolve what, if any, limiting instructions denial of the severance motion will require or to articulate what those instructions might be. The parties will have ample opportunity to revisit this issue when, in the ordinary course, in limine motions are considered.

Conclusion

In line with the foregoing, Campbell's motions to suppress the evidence derived from the tower dump warrant and its fruits and to sever two of the counts in the superseding indictment are denied.

Trial will commence on September 8, 2026 as scheduled.

So Ordered.

Dated: Brooklyn, New York
       June 30, 2026

/s/ Eric N. Vitaliano
ERIC N. VITALIANO
United States District Judge